UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                      :

UNITED STATES OF AMERICA

                      :

       - v. -

                      :      22 Cr. 281 (JPO)

JOHN COSTANZO JR. and
MANUEL RECIO,

                      :

                      :

           Defendants.

                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S OPPOSITION TO
## THE DEFENDANTS' POST-TRIAL MOTIONS

DAMIAN WILLIAM
United States Attorney
Southern District of New York

Mathew Andrews
Emily Deininger
Sheb Swett
Assistant United States Attorneys
    *- Of Counsel -*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 1

    A.    The Investigation and Trial............................................................................. 1

    B.    The Evidence at Trial ................................................................................... 2

ARGUMENT .................................................................................................................. 13

    I.    The Defendants' Rule 29 Motions Should Be Denied.................................... 13

    A.    Applicable Law............................................................................................ 13

    B.    Discussion ................................................................................................... 17

    II.    The Court Should Not Grant a New Trial ..................................................... 26

    A.    Applicable Law............................................................................................ 28

    B.    Relevant Facts............................................................................................. 30

    C.    Discussion ................................................................................................... 38

    III.    The Defendants' Motion To Dismiss Multiplicitous Counts Should Be Denied........... 54

    A.    Applicable Law............................................................................................ 54

    B.    Relevant Facts............................................................................................. 56

    C.    Discussion ................................................................................................... 57

CONCLUSION................................................................................................................ 59

# TABLE OF AUTHORITIES

**Cases**

*Albernaz v. United States*, 450 U.S. 333 (1981) ............................................................. 55

*Blockburger v. United States*, 284 U.S. 299 (1932) ........................................................ 55

*Braswell v. United States*, 487 U.S. 99 (1988) ....................................................... passim

*Bruton v. United States*, 391 U.S. 123 (1968) ............................................................... 51

*Crawford v. Washington,* 541 U.S. 36 (2004) ............................................................... 50

*Curcio v. United States*, 354 U.S. 118 (1957) ......................................................... 32, 44

*Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110 (2d Cir. 1999) ................... 41

*Greer v. United States*, 593 U.S. 503 (2021) ................................................................ 29

*In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155 (2d Cir. 2010) ......... 31

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................................... 14

*Johnson v. United States*, 520 U.S. 461 (1997) ............................................................. 49

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ........................................................................ 28

*Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ...................................................... 41

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ........................................... 38, 50

*Puckett v. United States*, 556 U.S. 129 (2009) .............................................................. 28

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ................................................ 29

*Samia v. United States*, 599 U.S. 635 (2023) ................................................................ 52

*Skilling v. United States*, 561 U.S. 358 (2010) .............................................................. 58

*United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008),
   *judgment entered,* 264 F. App'x 16 (D.C. Cir. 2008) ............................................. 43

*United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012) ................................................. 43

*United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020) ..................................................... 14

*United States v. Barlow*, 479 F. App'x 372 (2d Cir. 2012) ...................................... 28, 41

*United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004), *as amended* (Oct. 6, 2016) ......... 51

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) ............................................. 55, 56

*United States v. Chavez*, 549 F.3d 119 (2d Cir. 2008) ................................................... 14

*United States v. Collare*, 20 Cr. 17 (M.D. Pa.) ............................................................ 58

*United States v. Cotton*, 535 U.S. 625 (2002) ............................................................... 49

*United States v. Davis*, 689 F.3d 179 (2d Cir. 2012) ..................................................... 16

*United States v. Denton*, 944 F.3d 170 (4th Cir. 2019) ................................................. 43

*United States v. Eldridge*, 2 F.4th 27, 37 n. 11 (2d Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2863 (2022) ............................................................ 28, 41

*United States v. Ellis*, 460 F.3d 920 (7th Cir. 2006) ............................................................ 43

*United States v. Estrada*, 320 F.3d 173 (2d Cir. 2003) ........................................................ 55

*United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006) ................................................... 38, 50, 51

*United States v. Gahagen*, 44 F.4th 99 (2d Cir. 2022) .......................................................... 14

*United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979) ............................................................ 21

*United States v. Gore*, 154 F.3d 34 (2d Cir. 1998) ............................................................... 55

*United States v. Greenfield*, 831 F.3d 106 (2d Cir. 2016) ..................................................... 50

*United States v. Gutierrez Rodriguez*, 288 F.3d 472 (2d Cir. 2002).................................... 49

*United States v. Hardwick*, 523 F.3d 94 (2d Cir. 2008) ........................................................ 51

*United States v. Hoskins*, 44 F. 4th 140 (2d Cir. 2022) ........................................................ 14

*United States v. Hubbell*, 530 U.S. 27 (2000).................................................................. 32, 50

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2015) ........................................................... 20

*United States v. Hunt*, 534 F. Supp. 3d 233 (E.D.N.Y. 2021) ............................................... 43

*United States v. Jones*, 482 F.3d 60 (2d Cir. 2006) .............................................................. 55

*United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006).................................................... 55

*United States v. Joyner*, 313 F.3d 40 (2d Cir. 2002) ............................................................ 49

*United States v. Kerley*, 544 F.3d 172 (2d Cir. 2008) ........................................................... 55

*United States v. King*, 18 Cr. 318 (JDB) (D.D.C.)................................................................. 58

*United States v. King*, No. CR 18-318 (JDB), 2021 WL 880029 (D.D.C. Mar. 9, 2021) ........... 58

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................................. 14

*United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005)................................................... 20

*United States v. Marcus*, 560 U.S. 258 (2010) .................................................................... 45

*United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) ........................................................... 45

*United States v. Martinez*, 862 F.3d 223 (2d Cir. 2017), *cert. granted, judgment vacated sub nom. Rodriguez v. United States*, 139 S. Ct. 2772 (2019) ............................................. 29, 41

*United States v. McClain*, 377 F.3d 219 (2d Cir.), *supplemented,* 108 F. App'x 670 (2d Cir. 2004) ..................................................................................................................... 51

*United States v. Miller*, 808 F.3d 607 (2d Cir. 2015) ........................................................... 15

*United States v. Mohammed*, 27 F.3d 815 (2d Cir. 1994) ...................................................... 54

*United States v. Morgan*, 505 F.3d 332 (5th Cir. 2007) ........................................................ 43

iii

*United States v. Naranjo*, 14 F.3d 145 (2d Cir. 1994) .................................................................. 15

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) ................................................................ 54

*United States v. O'Garro*, 700 F. App'x 52 (2d Cir. 2017) .......................................................... 28

*United States v. Olano*, 507 U.S. 725 (1993) .............................................................................. 28

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ............................................................ 28

*United States v. Ragosta*, 970 F.2d 1085 (2d Cir. 1992) ............................................................ 14

*United States v. Regensberg*, 604 F. Supp. 2d 625 (S.D.N.Y. 2009) .................................... 55, 56

*United States v. Riggi*, 541 F.3d 94 (2d Cir. 2008) ..................................................................... 51

*United States v. Rijo*, 502 F. App'x 103 (2d Cir. 2012) ......................................................... 29, 42

*United States v. Rivera*, 971 F.2d 876 (2d Cir. 1992) ................................................................. 53

*United States v. Rodrigues*, 22 Cr. 391 (PMH) (SDNY) ............................................................ 58

*United States v. Rodriguez,* 968 F.2d 130 (2d Cir.1992) ............................................................ 54

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ..................................................... 15, 16, 17

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) .................................................................. 16

*United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ..................................................... 15, 16

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ............................................................... 21

*United States v. Santana*, 552 F. App'x 87 (2d Cir. 2014) ......................................................... 49

*United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) .................................................................. 15

*United States v. Silver*, 924 F.3d 538 (2d Cir. 2020) .................................................................. 15

*United States v. Smith*, 198 F.3d 377 (2d Cir. 1999) ............................................................. 15, 16

*United States v. Sotomayor*, 22 Cr. 122 (RDA) (E.D. Va.) ........................................................ 58

*United States v. Spruill*, 808 F.3d 585 (2d Cir. 2015) ................................................................ 29

*United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990) ......................................................... 15

*United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013) ...................................................... 28, 41

*United States v. Trenk*, 2006 U.S. Dist. LEXIS 84970, Case No. 06-1004 (D.N.J. November 20, 2006), *vacated in part on other grounds, sub nom.*, 2007 U.S. Dist. LEXIS 4273 (D.N.J. January 22, 2007).......................................................................................................... 32

*United States v. Weingarten*, 713 F.3d 704 (2d Cir. 2013).......................................................... 59

*United States v. Yeley-Davis*, 632 F.3d 673 (10th Cir. 2011) ..................................................... 43

*United States v. Young*, 470 U.S. 1 (1985) ............................................................................ 53, 54

*United States v. Zongo*, 15 Cr. 319, 2017 WL 2297010 (S.D.N.Y. May 24, 2017) (KMW) ....... 13

*United States v. Zvi*, 168 F.3d 49 (2d Cir. 1999) ........................................................................ 59

*Wilmington Tr., Nat'l Ass'n v. Rafiq*, No. 22-CV-6177 (JPO), 2023 WL 6237680 (S.D.N.Y. Sept. 26, 2023) ................................................................................................ 41

**Statutes**

18 U.S.C. § 1343 ....................................................................................................... 1, 57

18 U.S.C. § 1346 ....................................................................................................... 1, 57

18 U.S.C. § 1349 .......................................................................................................... 1

18 U.S.C. § 2 ................................................................................................................ 1

18 U.S.C. § 201 ......................................................................................................... 1, 57

18 U.S.C. § 3237 ......................................................................................................... 15

18 U.S.C. § 371 ............................................................................................................ 1

**Rules**

Fed. R. Crim. P. 18 ...................................................................................................... 14

Fed. R. Crim. P. 29 ...................................................................................................... 13

Fed. R. Evid. 803 ......................................................................................................... 38

**Constitutional Provisions**

U.S. Const. art. III § 2 ................................................................................................. 15

## PRELIMINARY STATEMENT

The Government respectfully submits this opposition to John Costanzo and Manuel Recio's post-trial motions for: (1) a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29; (2) a new trial pursuant to Federal Rule of Criminal Procedure 33; and (3) dismissal of certain of the counts in the Indictment. For the reasons set forth below, the defendants' motions should be denied in their entirety. The evidence introduced by the Government at trial demonstrated each element of the charged offenses beyond a reasonable doubt, and the issues raised by the defendants do not warrant a new trial or dismissal of counts.

## BACKGROUND

### A. The Investigation and Trial

On May 18, 2022, a grand jury sitting in this District returned Indictment 22 Cr. 281 (JPO) (the "Indictment"), charging the defendants with participating in a bribery scheme to trade confidential Drug Enforcement Administration ("DEA") information in exchange for financial and personal benefits (the "Bribery Scheme"). (Indictment, Dkt. 1 at 1-16). Specifically, the defendants were charged with one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (Count One); one count each of substantive bribery, in violation of 18 U.S.C. §§ 201 and 2 (Count Two (Costanzo) and Count Three (Recio)); one count of conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349 (Count Four); and one count of honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Count Five). (*Id*. at 16-22).

Trial commenced on October 23, 2023. On November 8, 2023, the jury returned a guilty verdict on all counts.

**B. The Evidence at Trial**

  *1. Overview of the Scheme*

Manuel Recio was a special agent with the DEA agent from approximately 1997 until his retirement in November 2018. (GX 101). During his time in the DEA, Recio served in the following supervisory roles: group supervisor in the Homestead, Florida office (Tr. 1733:2-6); a staff coordinator in the Financial Investigations Section at DEA headquarters (Tr. 958:3-5); and an Assistant Special Agent in Charge for the Miami Field Division (Tr. 129:5-11). After his retirement, Recio founded Global Legal Consulting LLC ("GLC"), a private investigative firm, and worked with defense attorneys, including David Macey and Luis Guerra.

John Costanzo Jr. was a special agent with the DEA from approximately 2004 through the date of the indictment. (GX 104). During his time in the DEA, Costanzo served in the following supervisory roles: group supervisor for Group 10 of the Miami Field Division (GX 106A); and staff coordinator in the Financial Investigations Section at DEA headquarters (GX 106A; Tr. at 964-965).

For over a year, Recio bribed Costanzo for confidential, sensitive information about DEA cases in exchange for nearly $100,000. Costanzo leaked information from the DEA's Narcotics and Dangers Drugs Indexing System ("NADDIS"), information about grand jury investigations, and information about law enforcement actions on sealed cases. In turn, Recio paid Costanzo bribes through trusted parties, including Costanzo's father and Costanzo's best friend, then-DEA Task Force Officer Edwin Pagan. Recio, Macey, and Guerra used the information Costanzo leaked to recruit and represent DEA targets. Costanzo and Recio took numerous steps to hide their criminal activity, including using a secret phone, deleting messages, and lying on DEA forms and on tax returns.

## 2. DEA Standards of Conduct

The DEA maintains a Personnel Manual that contains Standards of Conduct for DEA employees. The Standards of Conduct are found in Section 2735 of the DEA Personnel Manual. Section 2735.14 mandates "Impartiality in Performing Official Duties." That section bars the "improper use of nonpublic information to further [an employee's] own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure. Non-public information includes DEA sensitive information (e.g., information that may compromise an ongoing investigation or prosecution, provide an unfair advantage to a company competing for a DOJ/DEA contract, or reveal the identities of confidential sources (CSs) or DEA Special Agents (SAs) or Task Force Officers (TFOs)) . . . ." (GX 113A).

The DEA Standards of Conduct list certain conduct that constitutes "Misuse of Official Position," including:

a.   "Us[ing] his/her official position for private gain;"

b.   "Glean[ing] or garner[ing] information not available to the general public and us[ing] that information for nonofficial purposes. This includes conducting a search in a database that an employee has access to due to his/her employment with DEA;" and

c.   "Distribut[ing] or disclos[ing] information not available to the general public for nonofficial purposes."

(GX 113A).

DEA employees are required to receive training on the Standards of Conduct and certify their understanding of the Standards of Conduct on an annual basis. Costanzo completed certification trainings in 2018 and 2019. (GX 105). Recio completed certification training in 2016. (GX 110).

## 3. Background to the Conspiracy

Costanzo and Recio were friends who had worked together for many years in the

Homestead, Florida DEA office. (Tr. 139, 144). In 2014, Costanzo left the Homestead office to become Group Supervisor for Group 10 in the Miami Field Division. (Tr. 138-139). During his time as Group Supervisor for Group 10, Costanzo developed close relationships with Macey and Guerra, two criminal defense attorneys based in South Florida. (Tr. 612, 619-620). While these relationships were partly personal, (Tr. 1733-34), since at least 2015, up to and through October 2018, Costanzo provided both Macey and Guerra improper information and access regarding DEA cases. (GX 325, 337; Tr. 611-618; 620-635). For example, in April 2015 Costanzo and Macey exchanged text messages in which Costanzo told Macey he was trying to "close [a] deal" for Macey, who, in turn, told Costanzo: "Close the deal or not, the thought and effort puts you off the chart." (GX 337). Similarly, in 2018, Costanzo and Guerra met Jorge Luis Hernandez Villazon ("Hernandez"), who at the time was an informal DEA source, to ask him to recruit a DEA target for Guerra. (Tr. 611-618).

In October 2018, Recio was preparing to retire from the DEA to begin a second career as an investigator for defense attorneys. (Tr. 634-635). Costanzo knew that Recio was leaving the DEA and introduced Recio and Guerra. (GX 255). Around the same time, Hernandez was helping Macey recruit Group 10 defendants as clients, with Costanzo's knowledge. (GX 325). At some point in October 2018, Hernandez met with Recio at Macey's office, where Recio encouraged Hernandez to recruit clients for Recio's work with defense attorneys. Hernandez recalled Recio telling Hernandez that Hernandez had to "be very careful" regarding this work as it could impact Hernandez's immigration status. (Tr. 635). Hernandez testified to a similar conversation he had with Costanzo around the same time, in which Costanzo reminded Hernandez that Macey "was [Costanzo's] friend and to be very careful with whatever [Hernandez] was about to do [with Macey]." (Tr. 624).

On November 10, 2018, Recio retired from the DEA. (GX 101). Recio received his first payment—$5,000—from Macey on November 12, 2018. (GX 702 & GX 440B).

### 4. *Costanzo Leaked Information to Recio*

Almost immediately after Recio retired, Costanzo began leaking information to Recio. On November 13, 2018, Recio texted Costanzo the name "Marco Antonio Flores Moreno." Costanzo replied that "Flores is a general was just appointed to some minister of some shit." (GX 1001). Recio continued to ask Costanzo for information about Moreno and other individuals, asking two days later for Costanzo to "run Moreno and USA D&D." (GX 1001). A few minutes later, Costanzo ran both of those names through NADDIS. (GX 102). For approximately the next year, Recio continued to send Costanzo names, which Costanzo queried in NADDIS anywhere from a few minutes to a few days after Recio sent them. (GX 704B-2). On one occasion, Macey sent a name that Costanzo queried; on another occasion Pagan queried a name that Recio had sent. (GX 704B-2). Costanzo and Recio were often open about the fact that Costanzo was leaking NADDIS information. In one text message, Recio asked Costanzo for "help trying to see if you could help me find any of these guys. You looked before and you said the names were to[o] vague but David is placing a lot of pressure on me." (GX 347). In response, Costanzo said one of the individuals "ran loads to Costa Rica." (GX 347). In another instance, Recio sent Costanzo a name and said, "Call me and give me a summary of his NADDIS." (GX 339).

Costanzo provided this information from NADDIS to Recio despite clear warnings that he could not share this information. Agents logging into NADDIS had numerous cautions that the information was "DEA/Law Enforcement Sensitive" and "for Official Use only." (GX 118). Indeed, the DEA witnesses at trial uniformly testified that NADDIS information could not be shared with members of the public. (*E.g.*, Tr. at 161). Costanzo and Recio both knew that. During

his interview with law enforcement, Recio acknowledged that NADDIS information was sensitive but falsely denied ever asking Costanzo to run names in NADDIS. (Tr. at 1345:4-12).

Additionally, Costanzo leaked information about the indictment date for Alex Saab, an individual under investigation for high-level money laundering and foreign corrupt practices in Venezuela. (Tr. 834:22-25, 840:2-4). On July 4, 2019, Costanzo told Recio on a call that "the next indictment" was scheduled for July 25, 2019, the day a grand jury returned an indictment against Saab (GX 202A-T, GX S7). Costanzo assured Recio that Costanzo would "give you what you can say. If you get a meeting, let me know and I'll tell you what to say." (GX 202A-T). Michael Nadler, the Assistant United States Attorney responsible for the investigation, testified that the grand jury proceedings were secret by law and that Costanzo had no authorization to disclose information about Saab's indictment and arrest date. (Tr. 841-844, 846-847). Costanzo also knew that sharing this information was unlawful. When the FBI interviewed him in November 2019, he flatly denied ever sharing information or having any conversations about sealed investigations, which was not true. (GX 255-T).

This was not the only instance in which Recio used Costanzo's assistance to try to recruit DEA targets to work with himself and either Macey or Guerra. For example, on April 11, 2019, Recio met with Hernandez, who recorded the meeting at the direction of the FBI. (GX 253A-TR, GX 253B-TR). During that meeting, Recio told Hernandez that there would be an "operation . . . involv[ing] many Venezuelans" and that Recio and Hernandez had to be ready to "pick them up," meaning recruit them as clients. (GX 253B-TR, Tr. 651-652). Recio's advance knowledge of the operation would allow them to be "ready for the day that it happens immediately." (GX 253B-TR). Recio told Hernandez that he would direct these clients to Macey and Guerra, but that Recio wanted to manage the division of work between the two attorneys. (GX 253B-TR ("But everything

has to be through me. I... I don't want to start this because then Luis gets angry and Dave gets angry.")). Recio stressed to Hernandez that no one could know they had this information, because otherwise people would ask, "how did it come out?" (GX 253B-TR). Ultimately, Recio directed Hernandez to "do your homework but [shhh]." (GX 253B-TR). Hernandez testified that he understood the information about forthcoming indictments came from Costanzo. (Tr. 659).

Less than two weeks later, Costanzo shared additional information with Recio and Guerra to help them get the inside track to representing a Venezuelan Group 10 target. On April 23, 2019, Costanzo texted Guerra the name "Hector Zavala." (GX 397B; GX S7). Guerra then called Hernandez to tell him, "[w]e have a situation which could work for us in a very interesting way." (GX 252B-TR). Guerra told Hernandez that Zavala had been arrested by Group 10 and that "the person who arrested him is someone, we…we know very well." (GX 252B-TR). Hernandez testified that he understood this person was Costanzo. (Tr. 663). Guerra acknowledged that Macey was the other attorney receiving information from Costanzo. (GX 252B-TR). In a follow-up voicemail, Guerra instructed Hernandez not to "tell anybody where that information comes from. . . . [T]echnically we don't want people to know where…where it comes from." (GX 252A-TR). Costanzo appears to have also given Zavala's name to Recio to recruit; on April 23, 2019 (the same day Guerra called Hernandez), Recio texted Costanzo: "What does Zavala do? Any help in trying to find him[?]" Costanzo and Recio then exchanged phone calls. (GX 397A).

Costanzo also provided Recio with inside information while Recio and Macey were trying to recruit Cesar Peralta, a Dominican drug trafficker, as a client. Costanzo knew that Recio and Macey had both traveled to the Dominican Republic to try and recruit Peralta. (GX 201-T, GX 703). At the time, the FBI and the DEA both had sealed cases involving Peralta, though Costanzo had no involvement in either case. (Tr. 373). Yet when Recio asked Costanzo to gather information

about the FBI's case (GX 388), Costanzo told no one at the DEA or the FBI he was speaking to Recio and continued to discuss Peralta with Recio in secret. (DX JC-1009-A). Recio, in turn, discussed with Macey how to leverage the fact that they were "connected [and] informed" to recruit Peralta. (GX 380). Indeed, Both Macey and Recio knew that Peralta wanted to know the "specifics" of his case and would only "pay the rest of the money when [he saw] the proof." (GX 205-T, DX MR 143T). Recio even knew that Peralta had a DEA contact whom Peralta paid "and he tells us who is and who isn't wanted [] for extradition purposes." After hearing this, Recio simply warned Peralta, "[D]on't talk about this with anyone. We're going in 10 days and let's make a plan." (DX MR 141T).

On July 31, 2019, only a few weeks before the FBI attempted to arrest Peralta, Costanzo warned Recio that "the guy in the DR" was "gone in two weeks." (GX 210-T). Tellingly, Costanzo focused on warning Recio not to get caught in the Dominican Republic when the arrest occurred. (GX 210-T ("Don't fuck with that. Stay away from that cause it's dangerous too. Wait for it to happen.")). But Costanzo did not seem to care if Macey continued to meet with Peralta despite a looming arrest date. (GX 210-T ("Let Dave, fuck, if he wants to go whatever you don't and then when the time is right…")). Two days later, when communicating directly with Macey, Costanzo did little to dissuade Macey from "taking a shot" to recruit Peralta only a few weeks before Peralta's arrest. (GX 329).

On August 20, 2019, law enforcement attempted to arrest Peralta in the Dominican Republic, but Peralta was not there. (Tr. 411). Costanzo and Recio discussed the failed arrest in a phone call later that day. (GX 212A-T). However, despite Costanzo's knowing that Recio and Macey had been in contact with Peralta, Costanzo never shared that information with the case agents. (Tr. 412).

Finally, Costanzo also shared information about cooperating witnesses and informants with Recio concerning Guerra's and Recio's client. In September 2019, Costanzo reviewed and edited a document which summarized information about Recio's client Shirley Herrera Colorado. (GX 330, GX 330A, DX JC-2001). Recio and Guerra were preparing that document as part of a pitch to then-AUSA Nadler to reduce Colorado's sentence. (GX 215-T). However, Costanzo never told Nadler about these conversations with Recio, even though Nadler believed he "should have been included at the conversation. At a very high level, at no time should [an] agent be editing a document for a defense investigator or a defense attorney without [the prosecutor's] involvement." (Tr. 853-54). Costanzo knew that the information he was providing about Colorado was valuable to Recio. While Costanzo and Recio were discussing Costanzo's edits to the document, Recio said, "Make it look good, it's 30 grand right here." (GX 217-T). On another occasion, a "concerned citizen" contacted Costanzo with information about criminal activity, which Costanzo immediately shared with Recio with the instruction "not [to] show anyone." (GX 332 & GX 311-TR).

### 5. *Payments to Costanzo*

In exchange for violating his lawful duty by sharing DEA confidential information, Costanzo received nearly $100,000 in bribes from the following sources: (i) EBCO International of Miami ("EBCO"); (ii) JEM Solutions ("JEM"); (iii) Pagan; and (iv) gifts provided by Macey.

First, Recio and Macey paid Costanzo $2,500 on November 13, 2018. This was just three days after Recio retired from the DEA and only a day after Macey paid GLC (Recio's private investigative firm) $5,000. (GX 701). By this time, however, Costanzo had already started communicating with Recio about DEA cases. (GX 704B-2). Rather than pay Costanzo directly, Recio and Macey routed the payment through EBCO, a company Costanzo's parents owned. (GX

421). EBCO had, for the six months leading up to that payment, been completely dormant (Tr. 1682-1683), and had no original, contemporaneous records of the transaction (GX 529). GLC, however, produced documents establishing that the payment to EBCO related to Recio's requests to Costanzo for NADDIS information. (GX 530). Costanzo himself confirmed that the money was his when he told Macey, in a November 13, 2018, text message, "Just made 2500." (GX 317).

Second, Recio paid Costanzo through JEM, a company Pagan incorporated on January 31, 2019. (GX 502). From the outset, Costanzo was involved with JEM: the name was an acronym for John [Costanzo], Edwin [Pagan], and Manuel [Recio] (Tr. 1786), and Costanzo referred to it as "our company" in conversations with Pagan. (GX 507). On April 17, 2019, GLC wrote a $10,000 check to JEM. (GX 471A). JEM's records included a handwritten invoice suggesting this was an "[i]nvestment of risk management company." (GX 528). Pagan testified for the defense at trial and claimed that this $10,000 check was an investment "for office space." (Tr. 1801). According to Pagan, no written documents were necessary because he and Recio were good friends so Pagan "didn't think it was necessary." (Tr. 1749:5-13). However, on cross-examination Pagan conceded that he and Recio had no phone calls at all during the relevant period and only sporadic texts, none of which related to JEM. (GX 708, GX 360, Tr. 1796-1797).

GLC wrote a second, $10,750 check to JEM on June 3, 2019. (GX 471B). This check was purportedly related to "services for Johnny Grobman case." (GX 528). Pagan claimed, on direct, that he spent approximately eighty hours reviewing documents for the Grobman case. (Tr. 1767). On cross-examination, however, Pagan could not answer basic questions about the Grobman case and went back and forth as to whether he took notes on the Grobman work or not. (Tr. 1806-1807).

In fact, the evidence showed that almost all of the activity in JEM's account was Costanzo using it for personal travel. On three separate occasions, Costanzo booked himself first-class travel

using the JEM account. (GX 705). Pagan tried to claim that he paid for Costanzo's flights because Costanzo had paid for Pagan's car insurance payments and new tires. (Tr. 1754:8-16, DX JC-2623). But on cross-examination, Pagan admitted that if these insurance payments even existed, they came nowhere close to matching the amount Costanzo spent from the JEM account. (Tr. 1812:16-19).

Pagan also served as a conduit for bribes by providing Costanzo $70,000 in two separate payments, both of which were routed through trusted individuals. First, Pagan gave Costanzo Sr. $50,000 towards the purchase of Costanzo's townhouse. (GX 700). In an attempt to explain this largesse, Pagan testified at trial that this was an investment in Costanzo's townhouse. As with the JEM payments, however, Pagan could not articulate even the most basic facts about this purported investment. (Tr. 1772-1773). Pagan also acknowledged that he and Costanzo agreed Costanzo would lie to the mortgage company to conceal Pagan's involvement in the transaction. (Tr. 1777-79, GX 434A). In January 2020, Pagan paid Susana Rueda, Costanzo's erstwhile girlfriend, $20,000 she had previously loaned Costanzo for an attorney. (GX 701). Both of these payments exceeded Pagan's *entire* available net income in 2019 by more than $8,000. (GX 709).

Finally, Macey directly paid for renovations to Costanzo's townhouse. In February 2019, Macey introduced Costanzo to Juan Victorero, a general contractor. (Tr. 1246-47, GX 333). Costanzo hired Victorero to do some work at Costanzo's new townhouse in Coral Gables, Florida and agreed to pay approximately $9,500. Victorero received over half of the money Costanzo owed him from Macey rather than Costanzo. (Tr. 1253, GX 336). Though Costanzo told Victorero to collect the money from Macey because Costanzo was out of town, Costanzo's text messages with Macey clearly show that Costanzo was in Coral Gables the day that Macey paid Victorero. (GX 336). In addition to paying for the renovations, Macey also paid over $1,136 for Yankees tickets

for himself, Costanzo, and Nic Palmeri, another high-ranking DEA supervisor. (GX 525, GX 355, GX 385). Macey then paid for a nearly $700 dinner at a restaurant in New York City that same weekend. (GX 525).

These bribes from Macey were consistent with communications in which the co-conspirators discussed Macey and Guerra funding the Bribery Scheme. For example, in April 2019, Costanzo and Recio discussed whether they could "talk to Lui [Guerra] to go 50/50" on a client matter. (GX 384). On a July 4, 2019, phone call between Costanzo and Recio, however, Costanzo complained that Guerra had not "[brought] anything to the table," meaning money. (GX 202B-T). Recio countered that Guerra had brought approximately $130,000 to the scheme. (GX 202B-T). The very next day, Costanzo spoke with Guerra on the phone. Guerra complained that Costanzo had ignored him, to which Costanzo replied that Guerra needed to "love" Costanzo because Costanzo would be "running this fucking thing [the DEA] pretty soon." (GX 203-T). Guerra replied, "Okay, listen, so we're here scheming about how we're going to make money, money, money, so we're all on the same page." (GX 203-T).

### 6. Costanzo and Recio Hid the Scheme

Costanzo and Recio took numerous steps to hide the Bribery Scheme from the DEA and others. Most significantly, Costanzo and Recio covered their communications by using a secret phone (the "Secret Phone") and deleting their communications. Recio paid for the Secret Phone, though Costanzo was the user of the phone. (Tr. 464-468, GX 208-T, GX 209-T). When confronted about the Secret Phone in their interviews with FBI and DOJ-OIG, both Costanzo and Recio denied and downplayed the significance of the Secret Phone. (GX 3548-0002a, GX 255-T). But many of the calls where Costanzo leaked sensitive information occurred on the Secret Phone. (GX 203-T, GX 207-T, GX 210-T, GX 708). Additionally, Costanzo and Recio collectively deleted hundreds

of messages from their phones, including messages in which they discussed the Bribery Scheme. (GX 708, GX 361A, GX 361C, GX 363A).

Beyond hiding their communications, Costanzo and Recio lied to others about the nature of their relationship. Costanzo never disclosed his work with Recio to his supervisors in the DEA. (Tr. 145, 970-971). In fact, when Assistant Special Agent-in-Charge (ASAC) Daniel Escobar asked Costanzo what Recio was doing after his DEA retirement, Costanzo obfuscated and said, "Manny is doing his thing" without disclosing his involvement with Recio. (Tr. 144-145). Costanzo also hid his work with Recio on his SF-86 form in 2020, which required a disclosure of "all employment activities." (GX 104). Costanzo, Pagan, and Costanzo Sr. also failed to report the tens of thousands of dollars flowing between them on their IRS forms. (Tr. 1165, 1169-1170). And when Costanzo and Recio learned that there were rumors circulating relating to the Bribery Scheme, they discussed how they would "find people to put problems on" the individuals spreading those rumors. (GX 214-T).

## ARGUMENT

### I. The Defendants' Rule 29 Motions Should Be Denied

#### A. Applicable Law

##### 1. Rule 29

After the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c). "The Rule permits a district court to enter a judgment of acquittal on a count of conviction only if it finds that the evidence on that count is 'insufficient to sustain a conviction.'" *United States v. Zongo*, 15 Cr. 319, 2017 WL 2297010, at *1 (S.D.N.Y. May 24, 2017) (KMW) (quoting Rule 29). "It is a fundamental general principle that [defendants] challenging the sufficiency of the evidence underlying a conviction

bear a very heavy burden." *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992); *see also United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022) ("A defendant challenging the sufficiency of the evidence at trial bears a heavy burden, as the standard of review is exceedingly deferential").

"In considering such a challenge, [the court] must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, quotation marks, and brackets omitted). The court "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from the others." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gahagen*, 44 F.4th at 108.

 2. *Venue*

As with other aspects of Rule 29 motions, "[w]here the Government has prevailed at trial, [a court] reviews the sufficiency of the evidence as to venue in the light most favorable to the Government, crediting every inference that could have been drawn in its favor." *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016); *see also United States v. Hoskins*, 44 F. 4th 140 (2d Cir. 2022).

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; Fed. R. Crim. P. 18. When "the acts constituting the crime

and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015). Furthermore, the venue statutes provide that any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). Thus, where an offense is continuing, a defendant may be tried in any district in which some part of the offense occurred. *See, e.g., United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). "[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (internal citation and quotation marks omitted).

The Second Circuit has recognized that bribery is a continuing offense where venue may properly lie in multiple districts. *See, e.g.*, *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990). Accordingly, for bribery, venue lies in any district where the offense was "begun, continued, or completed." 18 U.S.C. § 3237(a). Additionally, the Second Circuit has held that wire fraud is a continuing offense for purposes of venue, *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015), and has held that honest services wire fraud, in particular, is a continuing offense as to the statute of limitations, *United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017)[1] ("[T]he Government need not prove that an official act occurred within the statute of limitations period. The Government need only prove that some aspect of the particular *quid pro quo* scheme continued

---

[1] Costanzo, relying on *United States v. Silver*, 924 F.3d 538 (2d Cir. 2020) (*Silver II*), argues that honest services wire fraud is not a continuing offense (Costanzo Br. at 26). *Silver II*, however, had nothing to do with venue and the phrase "continuing offense" does not even appear in the opinion. Rather, Costanzo is attempting to transform a single parenthetical quotation in *Silver II*, arising in a completely different context, into a new rule that honest services wire fraud is not a continuing offense. The Court should reject this reading of *Silver II*.

15

into the statute of limitations period."). For honest services wire fraud, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends." *Rutigliano*, 790 F.3d at 397.

It is well established, moreover, that, conspiracy is a continuing offense. *Id.* at 395-96. With respect to venue for a charge of conspiracy, the Second Circuit "has held that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *See Rommy*, 506 F.3d at 119–20 (citations omitted). Accordingly, "a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there." *Id.* (citing *Naranjo*, 14 F.3d at 147 (holding with respect to venue that conspiracy defendant "need not have been present in the district as long as an overt act in furtherance of the conspiracy occurred there"). Venue for a conspiracy charge "is [thus] proper in [any] district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (alteration in original) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)); *see also Rommy*, 506 F.3d at 119 (2d Cir. 2007).

Finally, where a defendant is charged with having aided and abetted a crime, as Costanzo and Recio were in Counts Three (bribery of a public official: Recio) and Five (honest services wire fraud: Costanzo and Recio), venue is proper either "where the . . . accessorial acts were committed *or* where the underlying crime occurred." *Smith*, 198 F.3d at 383 (emphasis in original). That is, "an aider and abettor is liable for the criminal acts of the principal, and this liability extends to establishing venue" in any district where the principal acted. *Id.* at 384.

Because "venue is not an element of any crime," it "need be proved only by a preponderance of the evidence." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012); *Rommy*,

506 F.3d at 119.

**B. Discussion**

In challenging the jury's verdict, Costanzo concedes that there was ample evidence to prove that Costanzo violated his lawful duties as a DEA agent but contends that there was insufficient evidence to prove that Costanzo received payments or that the payments were connected to Costanzo's repeated violations of his duties. Costanzo's reading of the evidence excludes large swaths of both direct and circumstantial proof, interprets the evidence in the light least favorable to the jury's verdict, and treats the various payments as distinct "vignettes," (Costanzo Br. at 16), rather than part of a scheme. Costanzo is wrong. When the evidence is viewed under the Rule 29 standard, it easily supports the jury's verdict.

*1. A Rational Trier of Fact Could Have Easily Found that Costanzo Received Bribe Payments in Exchange for Confidential DEA Information*

The Government introduced overwhelming evidence at trial establishing that Costanzo accepted bribe payments in exchange for violating his official duties by providing confidential DEA information to Recio. As described above, Costanzo leaked information from the DEA to Recio, including information from NADDIS and information about law enforcement actions, such as anticipated arrests and indictments, from grand jury investigations and sealed cases. (*See, e.g.*, GXs 207-T, 210-T, 253B-TR, 329, 330, 344, 347, 202A-T, 704B-2).

In exchange, Recio paid Costanzo more than $93,000 through trusted intermediaries, including the following:

- $20,750 paid by Recio, using his company GLC, to Costanzo via JEM Solutions, a company jointly formed by Costanzo, Recio, and Pagan and for which Costanzo had the online bank account login information. (GXs 507-2, 705).

- $2,500 paid by Recio, using GLC, via EBCO, a company owned by Costanzo's father. (GXs 317, 701).

- $50,000 paid via Pagan and Costanzo's father that was used as a down payment on a townhouse purchased by Costanzo. (GX 700).
- $20,000 paid via Pagan, who repaid $20,000 that Costanzo had borrowed from his then-girlfriend when hired a lawyer after being approached by the Government (GX 701).

Macey also directly made bribe payments to Costanzo as part of the scheme, including buying Costanzo tickets to a New York Yankees game (GX 355, 385), and paying approximately $5,000 to a contractor who was doing work at Costanzo's home (Tr. 1253; GX 336).

The Government also proved beyond a reasonable doubt that these payments were made in exchange for the confidential DEA information that Costanzo was providing; in other words, that the requisite *quid pro quo* existed. *First*, the Government introduced evidence that the $2,500 received by Costanzo via EBCO was a payment made in exchange for searches Costanzo had run for Recio in NADDIS. This came from GLC's own subpoena returns, which linked Costanzo's NADDIS searches to the November 12, 2018 payment GLC made to EBCO. (*See* GX 530.) And Costanzo acknowledged received $2,500, in a text message to David Macey, just one day after Costanzo provided Recio with the requested information from NADDIS, on the same day that Macey wrote a $5,000 check to Recio and just one day before Recio wrote a $2,5000 check to EBCO. (GXs 317, 701). Notably, the payment of this $2,500 came just three days after Recio's retirement, marking the beginning of the bribery scheme and establishing the course of conduct for future exchanges. (*See* GX 101).

*Second*, with regard to the payments made via JEM and EBCO, the evidence showed that there were no contracts, communications, or other evidence consistent with legitimate work having been done in exchange for that money. (*See supra* at 10**;** GX 706). There were, for example, no phone calls between Recio and Pagan in the six months leading up to the first check made out from Recio to JEM. (GX 706).

*Third*, the Government introduced evidence of numerous recordings and text messages demonstrating that Recio and Costanzo were working together to make money, despite the fact that Recio was a private citizen and Costanzo was employed by the DEA. For example, in a July 5, 2019 call between Recio, Costanzo, and Guerra, Guerra acknowledged that they were "here scheming about how we're going to make money, money money, so we're all on the same page." (GX 203-T; *see also* GX 330 (Recio telling Costanzo to edit a document so that it "look[s] good" because "it's 30 grand right here")). Costanzo and Recio further discussed the amount of fees they were collecting from Guerra (GX 202-B), and what split they could negotiate with Guerra (*see* GX 394 ("[m]aybe we can talk to lui to go 50/50"). Moreover, Costanzo referred to Recio as "my partner" (GX 1037), and passed information regarding DEA investigations to Recio and Guerra in a WhatsApp group labeled "Work" (GX 1034).

*Fourth*, the Government introduced overwhelming evidence that Costanzo and Recio attempted to conceal their relationship and the payments, from which a jury could easily draw an inference that Costanzo and Recio understood that these payments were improperly made to induce Costanzo to breach his official duties. Among other things, the evidence showed that Recio paid for a secret cellphone used by Costanzo, that Costanzo used that phone to provide confidential DEA information to Recio, and which both Costanzo and Recio lied about when interviewed by law enforcement. (*See supra* at 12). In addition, Costanzo deleted hundreds of messages between himself and Recio from his personal cellphone, including messages regarding their—"J[ohn & ]M[anuel']s—cut on a [] case" and how GLC's website was designed to "give *us* credibility." (GX 361A, 362C, 708). Costanzo also failed to inform his DEA supervisors of his dealings with Recio, despite the fact that Recio was, according to the defense theory, assisting the DEA by identifying cooperating witnesses. (Tr. 145 (Olesky); Tr. 970-71 (Escobar)). And when rumors about the illicit

relationship between Macey and Costanzo began circulating, Costanzo threatened to "find people to put problems on them." (GX 214-T). The proof of the defendants' consciousness of guilt provided powerful evidence supporting the jury's guilty verdict.

Based on the totality of this evidence, a reasonable juror could have easily found that Costanzo accepted bribe payments in violation of his official duties. Indeed, that evidence was overwhelming.

Ignoring almost all of the above-discussed evidence—including the recorded calls and messages establishing the understanding between the co-conspirators and the evidence of Costanzo and Recio's extensive efforts to conceal the scheme—Costanzo argues that the Government failed to prove (1) that Costanzo received the above-described payments; and (2) that the payments were made as part of a *quid pro quo*. (Costanzo Br. at 16).

As an initial matter, it bears noting that the jury was entitled to draw reasonable inferences based on circumstantial evidence—a basic principle of law that Costanzo seems to entirely ignore in advancing his Rule 29 motion. Costanzo's motion proceeds under the false premise that the Government was required to present direct evidence as to each and every element, including the crucial *mens rea* elements, which is simply not the law. *See, e.g.*, *United States v. MacPherson*, 424 F.3d 183, 189-90 (2d Cir. 2005) ("The law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."). Indeed, "the law draws no distinction between direct and circumstantial evidence" and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable." *Id.* (internal citations omitted); *see also United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2015) (jury could reasonably infer that the defendant had the requisite knowledge even though there was

"no direct evidence that the defendant saw or knew what was in any of the bags" because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.") (citing *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998); *United States v. Gleason*, 616 F.2d 2, 13 n. 7 (2d Cir. 1979)).

Viewing the totality of the evidence, rather than relying on Costanzo's false distinction between direct and circumstantial evidence, his arguments do no stand up. Costanzo first argues, with regard to the November 2018 $2,500 payment, that the Government failed to show Costanzo received that money. There was more than sufficient evidence, however, for the jury to infer that he did. As noted above, Costanzo wrote that he had gotten $2,500 on the very same day that he provided Recio information from NADDIS, the same day that that Guerra made a $5,000 payment to GLC, and immediately before GLC paid $2,500 to EBCO, Costanzo's father's company. (GXs 317, 701). A jury could easily infer from these circumstances that Costanzo Senior paid out the $2,500 that had been transferred to EBCO to Costanzo via some method other than bank transfer, such as cash. This is particularly true in light of the evidence that Costanzo deposited $1,500 in cash into his personal bank account just a few days later. (GX 412A). Moreover, there was no evidence of any alternative source of money that could have accounted for the $2,500 Costanzo discussed with Macey. (GX 412A). Finally, the jury could have reasonably inferred, from the fact that Macey asked no questions about the source of $2,500, that he knew where it came from— indeed, that he was the ultimate source of the money.

Costanzo also argues that the temporal link between the payments and the start of Costanzo's NADDIS searches is insufficient to establish the necessary *quid pro quo*. Even assuming that is correct (which it is not, as the jury was more than entitled to rely on circumstantial evidence to support its findings as discussed above), this argument should be easily dismissed

because it ignores GLC's subpoena response, which specifically identified the text messages about those NADDIS searches as being related to the $2,500 payment from GLC to EBCO. (GX 530). Thus, there was both direct evidence and circumstantial evidence supporting the jury's finding that the payments were in return for Costanzo running the NADDIS searches.

Costanzo further argues, with regard to the payments made via JEM Solutions, that "[n]ot a penny . . . ever made it into Costanzo's hands." (Costanzo Br. at 17). Undisputed evidence, however, established that Pagan gave Costanzo access to the JEM Solution bank account on the day the account was opened by providing Costanzo with the online login information, and that Costanzo used the account to buy himself plane tickets. (GXs 358, 507-2; 510A, 510B, 510C, 705). Indeed, Costanzo was the primary person to make use of the funds deposited into that account. (*See id*.)   And the jury could reasonably have chosen to give little to no weight to Pagan's testimony that Reco's payments were for legitimate business services or that Costanzo used the JEM Solutions bank account because Pagan owed him money. Even aside from the fact that Pagan's testimony was the *only* evidence that there were legitimate reasons for the payments, Pagan was unable to answer basic questions regarding that purported legitimate work, and his testimony was wholly inconsistent with the lack of business records and communications between Pagan and Recio.

As for the $70,000 Pagan gave Costanzo for the townhouse downpayment and lawyer fees, Costanzo argues primarily that the evidence was insufficient because there was no direct paper trail demonstrating that the money came from Recio, Guerra, or Macey. (*See* Costanzo Br. at 18). Of course, no such paper trail is required. The evidence overwhelmingly established that Costanzo and Recio used Pagan as a conduit for bribe payments in the case of JEM Solution. And bank and tax records demonstrated that the payments were well beyond Pagan's means, totaling almost

$9,000 *more* than Pagan's net income for 2019 and the vast majority of the money that he testified to having saved over the course of approximately twenty-six years. (*See* Tr. 1737, GXs 410B, 709). Based on that evidence alone, a juror could reasonably infer that Pagan was being used as a conduit for bribe payments, just as he was when Recio made payments to JEM Solutions, with money being supplied to Pagan via some means other than a transfer into Pagan's bank account, such as cash. Such an inference is especially reasonable where the two defendants have substantial expertise and experience in money laundering techniques. (Tr. 958, 988-99)

But the evidence also overwhelmingly established that Costanzo had sought to conceal the origins of this money, with Costanzo and his father falsely claiming to the bank that it had come from Costanzo Senior. (GX 434A). The only explanation offered at trial for this lie was Pagan's testimony that he and Costanzo were really committing mortgage fraud, since Pagan wanted to invest in the townhouse but knew that the banks would not accept the money towards a down payment if it came from a friend (Tr. 1778-1779)—and yet Pagan could not coherently answer even basic questions about this purported investment, like what his ownership share would be. (Tr. 1772-1773). Nor did Pagan offer any credible explanation as to why he was repaying Costanzo's loan to Rueda. (Tr. 1779-1780). These were far from "normal, run-of-the-mill, cost-sharing payments among friends" (Costanzo Br. at 17), and the jury thus had ample grounds to discredit Pagan.

Finally, Costanzo argues that the evidence did not connect the payments, including the payments from Macey, to any violation of Costanzo's official duties.[2] (Costanzo Br. at 19-20).

---

[2] Costanzo also argues in passing that the evidence regarding the payment from Macey to Victorero showed only that Costanzo left money with Macey. While this is the explanation that Costanzo provided to Victorero as to why Macey had the money from him (Tr. 1258), this story

This argument also ignores substantial evidence presented at trial. As discussed above, the Government presented ample evidence of continued, repeated instances in which Costanzo improperly shared confidential DEA information with Recio, Guerra, and Macey, beginning in November 2018 after Recio's retirement and continuing up until the time of Costanzo's and Recio's arrests. The above-discussed bribe payments occurred during this same time period. And "[o]nce the quid pro quo has been established"—as it was, here, with the initial $2,500 payment— "the specific transactions comprising the illegal scheme need not match up this for that." *United States v. Silver*, 864 F.3d 102, 122 n. 110 (2d Cir. 2018) (quoting *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013)); *see also United States v. Mangano*, 2018 WL 851860, at *2 (E.D.N.Y. Feb. 9, 2018).

### 2. *Venue Was Proper in the Southern District of New York*

Costanzo's argument regarding venue is premised on the misguided assumption that "the only conduct that the jury could have possibly considered criminal was a single alleged payment of $2,500 in November 2018." (Costanzo Br. at 25). For the reasons discussed above, however, Costanzo is wrong. All of the above-discussed payments were part of that bribery scheme, which lasted through at least October 2019, and encompassed the events that sufficiently established venue on all counts as to the broader scheme.

Venue as to all counts was premised in part on a July 16, 2019 call that Recio placed from the Southern District of New York to Costanzo. (*See* GX 207-T; S1). In that call, Costanzo provided Recio with confidential information regarding an arrest about to be conducted by

---

was disproved by Costanzo's contemporaneous text messages with Macey, in which it is clear that Costanzo was *not* out of town as they discussed Costanzo going to Macey's house later that day. (GX 336).

Homeland Security Investigations ("HSI")—confidential information that Costanzo had only as a result of his supervisory role at the DEA. (GX 207-T). Costanzo then goes on to note that "if there's anything that benefits the DEA I would jump on it." In other words, Costanzo could not simply poke around into an HSI case, but if there was a DEA angle, he would have a plausible reason to gather inside information.

Costanzo argues this call has "no relationship to the alleged bribe of $2,500." (Costanzo Br. at 27). But this misses the point. The call, in which Costanzo is sharing confidential information regarding a planned arrest, is part and parcel of the bribery scheme and Costanzo's violations of his official duties. This district is therefore one location where substantive offenses of bribery and honest services wire fraud were conducted. *See Stephenson*, 895 F.2d at 875. And likewise, this conversation was in furtherance of the charged conspiracy.

Costanzo further argue that the July 16 phone call was insufficient to establish venue with regard to the conspiracy counts because it was not foreseeable to Costanzo that Recio would call him from New York. (Costanzo Br. at 28). Costanzo's argument, however, ignores not only that Costanzo and Recio discussed Recio's upcoming trip to New York in an earlier call (GX 202C-T) (Recio stating that he would "be going to New York the week of the 19th"), but also that Recio mentioned twice during the call itself that he was in New York (GX 207-T at 3 & 4). His presence in this district was thus reasonably foreseeable—indeed known—to Costanzo. *See Rommy*, 506 F.3d at 120 (finding venue for drug conspiracy proper where conspirators made calls into the district and noting that "[i]n cases involving telephone calls between co-conspirators in different districts, we have ruled that venue lies 'in either district as long as the calls further the conspiracy'" (quoting *Smith*, 198 F.3d at 382)) (collecting cases).

Venue on Counts One, Two, Three, and Four was also premised on a trip to the Southern

District of New York for which Macey paid for Costanzo and Nic Palmeri, another DEA agent to attend a Yankees game. That event was an essential continuation of the bribery scheme for two separate reasons: *First*, as discussed above, a jury could have reasonably inferred that Macey paid for the tickets because of and in exchange for the confidential DEA information that Costanzo was providing to him, Recio, and Guerra. In other words, the payment for the Yankees tickets was one of the bribe payments, and Costanzo's receipt of those tickets and attendance at the Yankees game was thus necessarily a continuation of the scheme.

*Second*, a jury could have reasonably inferred from the evidence that paying for attendance at the Yankees game that occurred in the Southern District of New York was part and parcel of Costanzo's effort to develop internal sources—namely, Nic Palmeri—that he could utilize to obtain further DEA confidential information for the benefit of Recio, Macey, and Guerra. Notably, Costanzo and Macey discussed, prior to the game, how Macey bought the tickets "so that Mr. Palmeri would not be disappointed." (GX 355). And later, after Palmeri was promoted to Regional Director of Mexico for the DEA, Costanzo celebrated to Recio that "[w]e about to own Mexico." (Tr. 978, GX 386). In other words, the Yankees game was an attempt, as part of the scheme, to develop another inside source—an effort that Costanzo and Recio believed had been successful and from which they would be able to begin reaping benefits. For both of those reasons, the Yankees game was part and parcel of and continuation of the scheme, not just a mere social outing among friends.

## II. The Court Should Not Grant a New Trial

The defendants next argue that they are entitled to a new trial because the Government allegedly violated Recio's Fifth Amendment rights and Costanzo's Sixth Amendment right to confrontation. Although unpreserved and somewhat ambiguous, the arguments appear to be as

follows. Recio asserts for the first time in his Rule 29 motion, relying on *Braswell v. United States*, 487 U.S. 99 (1988), that the Government improperly posed questions to Investigative Analyst Rachel Danko about GLC's "production in response to the Trial Subpoena, and also in response to a prior grand jury subpoena dated February 23, 2023." (Recio Br. at 1). In particular, Recio complains that the "government elicited testimony from Danko that 'GLC is the company that Manuel Recio had created[,]' Tr. at 1028:9-12, that 'Manual [sic] Recio's company, Global Legal Consulting . . . receive[d] subpoenas for records[,]' Tr. at 1038:9-12, and that Mr. Recio was the custodian of records responsible for the production in response to the Trial Subpoena. Tr. at 1046:21-24." (Recio Br. at 1-2). Recio further complains that the Government asked Danko about "what was and was not included" in the subpoena returns, and "focused on the alleged $2,500 payment, arguing that the Trial Subpoena production was an admission of guilt by Mr. Recio and direct evidence for the jury to find Mr. Recio guilty of all charges." (Recio Br. at 2). Costanzo, in turn, argues for the first time that the Government violated his Sixth Amendment right to confrontation by introducing the above-described testimony and making the above-described argument to the jury. (*See* Costanzo Br. at 29).

The defendants do not claim that these newfound objections were preserved at trial—nor could they. As set forth below, the defendants waived these Fifth and Sixth Amendment challenges by stipulating not only to the fact that Recio prepared GLC's grand jury subpoena productions but also that GLC's grand jury subpoena production was admissible as evidence. The defendants further waived objection to the admission of GLC's trial subpoena production at trial. This waiver bars any review for error. Furthermore, even if Recio and Costanzo merely forfeited their objections, and a plain error analysis applied, they have failed to show that there was plain error in admitting GLC's subpoena returns, let alone a plain error that affected the defendants'

27

substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. In sum, Recio's and Costanzo's newfound constitutional objections are without merit and do not provide a basis for a new trial.

### A. Applicable Law

#### 1. Waiver

"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Where a defendant has waived, "*there [was] no error at all and plain-error analysis would add nothing,*" *United States v. O'Garro*, 700 F. App'x 52, 53 (2d Cir. 2017) (quoting *Puckett v. United States*, 556 U.S. 129, 138 (2009) (emphasis in original)).

An "affirmative stipulation normally might give rise to a finding of actual waiver (as opposed to mere forfeiture) of the issue, barring all review on appeal." *United States v. Eldridge*, 2 F.4th 27, 37 n. 11 (2d Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2863 (2022); *United States v. Stitsky*, 536 F. App'x 98, 107 (2d Cir. 2013) (holding that "stipulation effectively waived defendants' right of confrontation"); *United States v. Barlow*, 479 F. App'x 372, 373 (2d Cir. 2012) (holding that stipulation waived defendant's right to challenge one of the elements of the offense). Moreover, a finding of waiver is particularly appropriate "when . . . defendants not only failed to object to what they now describe as error, but they actively solicited it." *O'Garro*, 700 F. App'x at 53 (quoting *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007)). Thus, for instance, the Second Circuit has found waiver where counsel "was specifically asked at trial whether he had any objection to the admission of proffered evidence . . . , he answered, 'None.'" *United States v. Martinez*, 862 F.3d 223, 234 (2d Cir. 2017), *cert. granted,*

*judgment vacated sub nom. Rodriguez v. United States*, 139 S. Ct. 2772 (2019). The Second Circuit has also found waiver where, among other things, counsel "plainly stated that he had no objection to admission of the proffered evidence." *United States v. Rijo*, 502 F. App'x 103, 106 (2d Cir. 2012).

### 2. Forfeiture

"Forfeiture occurs when a defendant, in most instances due to mistake or oversight, fails to assert an objection in the district court." *United States v. Spruill*, 808 F.3d 585, 596-97 (2d Cir. 2015). "By contrast, waiver can result only from a defendant's intentional decision not to assert a right." *Id.* at 597. "[T]he critical determination" is "that the defendant, through counsel, acted intentionally in pursuing, or not pursuing, a particular course of action." *Id.*

The Court applies a plain error analysis when a defendant merely forfeits, rather than waives, the assertion of a right. To establish eligibility for plain-error relief, a defendant must satisfy three threshold requirements:

> *First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect 'substantial rights,' which generally means that there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'

*Greer v. United States*, 593 U.S. 503, 507-08 (2021) (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 134-135 (2018)). If those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on "the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Rosales-Mireles*, 585 U.S. at 135).

### 3. The Supreme Court's Decision in Braswell

In *Braswell v. United States*, 487 U.S. 99 (1988), the Court addressed the question of whether a corporate employee could claim a Fifth Amendment act of production privilege to refuse to produce corporate documents. The Court held that the employee—an officer of two closely-

held corporations—who had been individually subpoenaed to produce corporate books and records, could not invoke the Fifth Amendment to refuse production even though the documents might provide the government with evidence that could incriminate him. *Id.* at 109-10. Should the custodian stand trial, the Government could not introduce evidence that the custodian himself produced the records since he acted in his representative and not personal capacity. *Id.* at 117-18. The Court acknowledged, however, that the jury could still permissibly infer that the custodian was the source of the documents:

> The Government has the right, however, to use the corporation's act of production against the custodian. The Government may offer testimony—for example, from the process server who delivered the subpoena and from the individual who received the records—establishing that the corporation produced the records subpoenaed. The jury may draw from the corporation's act of production conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena. *And if the defendant held a prominent position within the corporation that produced the records, the jury may, just as it would had someone else produced the documents, reasonably infer that he had possession of the documents or knowledge of their contents*. Because the jury is not told that the defendant produced the records, any nexus between the defendant and the documents results solely from the corporation's act of production and other evidence in the case

*Id.* at 118 (emphasis supplied).

## B. Relevant Facts

### 1. Recio Disclaimed Braswell as a Basis to Quash the GLC Subpoenas

The Court previously denied Recio's motions to quash two subpoenas on GLC on Fifth Amendment grounds. The Court first denied GLC's motion to quash a grand jury subpoena on July 17, 2023 (the "First Denial Order"). As set forth in the parties' briefing and in the First Denial Order, on February 22, 2023, the Government served a grand jury subpoena on the custodian of record for GLC for various categories of documents (the "GLC Grand Jury Subpoena"). (First Denial Order, at 1). Recio filed a motion to quash on March 6, 2023 (the "First Motion to Quash").

Recio's motion did not assert his newfound objection under *Braswell* as a basis to quash the GLC Grand Jury Subpoena. Instead, the motion primarily asserted that the subpoena lacked a proper purpose because it sought materials for trial rather than the grand jury. (*See id.* at 2-4). The motion also argued, in a conclusory fashion, that the subpoena violated Recio's Fifth Amendment rights because it sought "materials directly from and personal to Mr. Recio, such as his bank accounts and communications with Special Agent Costanzo, in violation of his Fifth Amendment rights." (*Id.* at 4). The Court denied the motion to quash because "the Second Circuit has held that corporations cannot avail themselves of the Fifth Amendment's protection against the compelled production of potentially incriminating testimonial communications, based on the 'long-established' collective entity rule." (Denial Order, at 3 (quoting *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 157 (2d Cir. 2010) (citation omitted)). The Court accordingly held that "the motion to quash is denied as to any records held by Recio in his representative capacity as custodian of record for Global Legal Consulting, LLC." (*Id.* at 4).

GLC provided subpoena returns along with a signed custodian of record form under Rules 902(11) and 803(6) on or about July 26, 2023(the "GLC Grand Jury Subpoena Returns"). Recio voluntarily signed as "custodian of record" certifying the records:

(1) were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters;
(2) were kept in the course of regularly conducted business activity; and
(3) were made by the regularly conducted business activity as a regular practice.

(*See* GX 520 at 7).

The Government thereafter served a trial subpoena on the custodian of record for GLC on or about August 28, 2023 (the "GLC Trial Subpoena"). The GLC Trial Subpoena attached three invoices for three bribery payments at issue at trial:

- The $2,500 from GLC to EBCO on November 14, 2018 ("Exhibit A");
- The $10,000 from GLC to JEM Solutions on April 17, 2019 ("Exhibit B"); and
- The $10,750 check from GLC to JEM Solutions on June 3, 2019 (Exhibit C).

The GLC Trial Subpoena then requested the following materials:

- "All documents, communications, or other records related to the November 12, 2018 invoice [the $2,500 payment];" and
- "All documents, communications, or other records related to the April 17, 2019 invoice [the $10,000 payment];" and
- "All documents, communications, or other records related to the June 3, 2019 invoice [the $10,750 payment]."

Recio filed a motion to quash the trial subpoena on or about September 9, 2023. (*See* Dkt. 111 (the "Second Motion to Quash")). Once again, Recio did not raise his objection under *Braswell* in his opening motion. Instead, Recio cited several inapposite decisions regarding subpoenas on individuals (not corporations) for the principle that individuals have Fifth Amendment rights. (*See id.* at 3 (citing *United States v. Hubbell*, 530 U.S. 27, 29 (2000); *Curcio v. United States*, 354 U.S. 118 (1957); *United States v. Trenk*, 2006 U.S. Dist. LEXIS 84970 at *21, Case No. 06-1004 (D.N.J. November 20, 2006), *vacated in part on other grounds, sub nom.*, 2007 U.S. Dist. LEXIS 4273 (D.N.J. January 22, 2007))).

The Government filed an opposition on September 25, 2023 citing the rulings in the First Denial Order. (*See* Dkt. 112). Recio filed a reply brief on October 2, 2023. (*See* Dkt. 122). Although Recio cited *Braswell* in a footnote, he (correctly) did not rely upon it as a basis to quash the subpoena. Rather, Recio stated in a footnote that "the Court need not rule on the constitutional issues because the government has not satisfied the requirements under Rule 17(c)." (*See id.* at 3 n.2). Recio went on to state in the same footnote the following with respect to the import of *Braswell*:

It is important to note that the Supreme Court in *Braswell v. United States*, 487 U.S. 99 (1988) clarified *Curcio* and held that although an individual cannot raise the act

32

of production as a defense to a corporate subpoena, the government cannot make evidentiary use of a corporation's act of production against the individual. *Braswell*, at 118. ("Therefore, the Government concedes, as it must, that it may make no evidentiary use of the 'individual act' against the individual. For example, in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian."). In other words, as applied here, the government cannot use GLC's response to the subpoena against Mr. Recio. Furthermore, the government's request for materials Mr. Recio will rely upon in his defense, without further identification of those materials, distinguishes the cases that hold that a custodian cannot assert the Fifth Amendment in response to a corporate subpoena.

(*Id.*).

The Court denied Recio's motion to quash on October 10, 2023. (*See* Dkt. 134 (the "Second Denial Order")). The Court did not address *Braswell* because Recio did not raise it as a ground to quash the subpoena. Instead, the Court addressed Recio's claim, raised in his opening motion, that "the [trial] subpoena seeks testimonial information in violation of his Fifth Amendment privilege against self-incrimination." (*Id.* at 2). The Court stated that it "has already rejected this argument in connection with Recio's previous argument to quash a grand jury subpoena" because "corporations cannot avail themselves of the Fifth Amendment's protection against the compelled production of potentially incriminating testimonial communications." (*Id.* at 3).

On or about October 22, 2023—the day before trial began—counsel for GLC produced the GLC Trial Subpoena returns to the Government and codefendant John Costanzo. The subpoena returns contained headers specifying which materials were relevant to which request:

Documents Responsive to Request #1:
All documents, communications, or other records related to the November 12, 2018 invoice.

. . . .

Documents Responsive to Request #2:
All documents, communications, or other records related to the April 17, 2019

> invoice.
>
> . . . .
>
> Documents Responsive to Request #3:
> All documents, communications, or other records related to the June 3, 2019
> invoice.

(GX 530 at 2, 8, 12). As with the GLC Subpoena Returns, GLC included a custodian of record

form, signed by Manuel Recio, stating under penalty of perjury that the returns were business

records under Rules 902(11) and 803(6) (the "GLC Trial Subpoena Returns"). (*Id.* at 1).

The Government marked the GLC Grand Jury Subpoena, Grand Jury Subpoena Returns,

GLC Trial Subpoena, and the GLC Trial Subpoena Returns as GX 520, GX 522-524, GX 528, and

GX 530, respectively, and produced the exhibits to all counsel on or about September 27, 2023

(the grand jury subpoena materials) and October 23, 2023 (the trial subpoena materials).

## 2. *The Defendants Waived their Objections to the GLC Subpoena Returns at Trial*

Prior to trial, counsel for Manuel Recio and John Costanzo agreed to a stipulation that the

GLC Grand Jury Subpoena and Grand Jury Subpoena Returns—including Recio's signed

custodian of record form stating that he prepared the production—were admissible and "***may be***

***received into evidence at trial***." (GX S3) (emphasis added). The defense further waived objection

to the admission of the GLC Trial Subpoena and the GLC Trial Subpoena Returns—which

included an identical, signed custodian of record form by Recio—during the testimony of Rachel

Danko. (Tr. 1013:5-10). In particular, when the Government sought to introduce the GLC Trial

Subpoena (GX 528) and the GLC Trial Subpoena Returns (GX 530) along with certain other

exhibits, the defense chose to object only to certain of the other exhibits but did not object to the

introduction of the GLC Trial Subpoena or the GLC Trial Subpoena Returns. (*See id.* ("The Court:

Any objection. Ms. Young. Objections as to 450 to 454 and 532 to 534 those were subject to

motions *in limine*.")).

The Government then asked Danko to read from the exhibits in evidence. The Government first had Danko read from the GLC Grand Jury Subpoena and Grand Jury Subpoena Returns. (*See id.* at 1038:9-1042:9). Danko testified, among other things, that GLC produced no contracts, agreements, reports, or communications supporting any of the three payments to EBCO or JEM Solutions. (*See id.* at 1040:12-1042:9). Significantly, defense counsel raised no objection to the substance of any portion of the testimony.

The Government then had Danko read from the GLC Trial Subpoena and GLC Trial Subpoena Returns again without objection from defense counsel. Thus, the Government asked Danko to read from the custodian of record form signed by Recio without objection. (*See id.* at 1046:19-24 ("Q. . . . under this declaration of custodian of records form, would you mind just reading who is listed as the custodian? A. Manuel Recio."). The Government asked Danko to read from the GLC Trial Subpoena Returns without objection:

> Q. Okay. So now we can go to page 2. So page 2, can you please read this text out loud?
>
> A. "Documents responsive to request no. 1. All documents, communication, or other records related to the November 12, 2018 invoice."
>
> Q. So what we are about to see are what Global Legal Consulting says are all the documents, communications, or other records relating to this $2500 payment from Global Legal Consulting to EBCO, is that correct?
>
> A. Correct.

(Tr. 1046:25-1047:15). The Government then asked Danko to read the text messages produced by GLC without objection:

> Q. All right. So let's read these text messages between Manuel Recio and John Costanzo, Jr. that Global Legal Consulting is saying relate to the $2500 payment. Can you please read the second and third messages, noting the date and the sender?
>
> A. "11/15/2018, 3:29:29 p.m. John, can you run Moreno and USA D&D?" John Costanzo responds, "Yeah."

35

(*Id.* at 1049:11-14). When the Government began to ask the next question, counsel for Recio asked

for a sidebar:

> Q. Let's see if this name Moreno has come up before. Let's do a split screen now.
> I would like to put up Government Exhibit 704B-2 next to Government Exhibit
> 530.
>
> Ms. Donner: Your Honor, can we go to sidebar? We have an objection.

(*Id.* at 1049:19-23). Counsel then raised the following objection at sidebar—which was

not the constitutional challenge under *Braswell* that Recio and Costanzo now assert as the

basis for a new trial in their post-trial motion:

> Ms. Donner: So Mr. [Andrews] is suggesting a purpose for which we provided and
> responded to the grand jury subpoena and identifying language and suggesting the
> purpose for which it was provided, but that isn't the purpose for which it was
> provided. There is other information on that text message that's relevant to the
> invoice, and for Mr. Andrews to suggest to a witness who has no idea what the
> purpose for which the document was provided is improper and we object. She can
> read the document if she wants, but he can't suggest what the purpose is.

(*Id.* at 1050:2-11). The Government responded as follows:

> Mr. Andrews: Judge, this isn't cute color commentary. I am quoting what they are
> saying in their subpoena response, which are these are the documents relating to
> the $2500 payments. That is quoting their language. If they want to put up a witness
> as to their intention upon producing the documents, they are welcome to do so, but
> they have produced the documents and we are now entitled to have the witness read
> another exhibit into the record.

(*Id.* at 1050:16-23). The Court agreed with the Government: "I mean, it is what it is. I still don't

understand the point you are making about how this is misleading. This is the subpoena

response." (*Id.* at 1052:15-17).

Thereafter, the Government properly made argument during closing arguments—without

objection—from the admitted evidence. The Government stated in relevant part during

summation:

So the first reason you know the quid and the quo are connected is the records Global Legal Consulting provided in response to a subpoena told you they were. Let's look at Government Exhibit 530. Government Exhibit 530 contain Global Legal Consulting's response to the subpoena. You can go look at the entire thing if you want, records that were pulled together by Manny Recio. The subpoena had asked for any records relating to the three invoices we talked about earlier, the two handwritten JEM invoices and the November 12, 2018 EBCO invoice, that was supposedly for the $2,500 worth of investigative services. Sorry, this invoice, the one you're looking at here. And what did Global Legal Consulting provide as records relating to that EBCO invoice? Text messages from Recio asking Costanzo to run names in the DEA's law enforcement sensitive NADDIS databases. Not any communications between Recio and John Costanzo, Sr., who supposedly EBCO was his company, but messages between Recio and Costanzo and messages specifically asking for DEA confidential information, names that Costanzo did run in the NADDIS database, and where he did provide information to Recio.

(Tr. 1913:1 – 1914:2).[3] The Government also argued during rebuttal:

Okay. I want to touch on two things briefly, two pieces of evidence that essentially resolve this for you. Again, defense counsel said over and over there is nothing direct about this case, there is nothing direct, it is all circumstantial. Well, as an initial matter, I expect Judge Oetken will instruct you that evidence is evidence. You can rely on circumstantial evidence, you can rely on direct evidence. In fact, in a case involving conspiracy and in a case involving this kind of criminal conduct, it's not unusual to have some circumstantial evidence. It's not unusual that the defendants, that the criminal coconspirators won't talk about it in the open. But you have direct evidence. You have direct evidence in the form of the GLC subpoena returns that AUSA Deininger walked you through. Global Legal Consulting, Manuel Recio's company, received a subpoena to provide records about the $2500 payment. Manuel Recio, he was the one who collected those records and he put them together. And what did he provide? Text messages between him and Costanzo talking about the NADDIS searches. Is that not direct evidence? That is Recio, that is Global Legal Consulting truthfully admitting that the reason Costanzo got that payment – the reason EBCO got that payment was because Costanzo was leaking DEA information and NADDIS information.

(*Id.* at 2004:5 – 2005:4).[4]

---

[3] Notably, the defendants did not object during this portion of the Government's summation, despite clearly already being aware of *Braswell* prior to trial, as evidence by the footnote in support of their motion to quash discussed above.

[4] The defendants once again did not object to this portion of the Government's rebuttal summation.

## C. Discussion

The defendants do not (and cannot) argue that the substance of the subpoena productions from GLC are testimonial. As the defendants acknowledge, business records are not testimonial. (*See* Costanzo Br. at 34 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation because . . . they are not testimonial."); *see also United States v. Feliz*, 467 F.3d 227, 236 (2d Cir. 2006) ("In sum, therefore, we hold that where a statement is properly determined to be a business record as defined by Fed. R. Evid. 803(6), it is not testimonial within the meaning of Crawford[.]")). Likewise, the defendants cannot meaningfully claim that Investigative Analyst Rachel Danko improperly testified that "GLC is the company that Manuel Recio had created," (Tr. 1028:9-12), and that "Manual Recio's company, Global Legal Consulting . . . receive[d] subpoenas for records," (Tr. 1038:9-12). This testimony was based on admitted evidence. Indeed, this testimony related to an issue that was not even in dispute at trial. Recio's counsel himself stated in his opening that GLC was Recio's "own company," (*see* Tr. 122:14-23), and counsel for both defendants stipulated to the admission of the GLC Grand Jury Subpoena and related returns (*see* GX S3).

Instead, the defendants' newfound objections boil down to one sentence of Danko's testimony: that Recio was the custodian of records for the GLC subpoenas productions. (*See* Recio Br. at 1-2 (citing Tr. 1046:21-24)). From there, the defendants contend that it was improper for the Government to argue during summation that Recio was involved in the GLC subpoena productions and that the productions were an admission of guilt by Recio.

The defendants are not entitled to a new trial on this basis. First and foremost, the defendants affirmatively waived these grounds for a new trial by (i) stipulating to the admission of Recio's first signed custodian of record form as part of the GLC Grand Jury Subpoena Returns;

(ii) affirmatively not objecting at trial to the introduction of Recio's second signed custodian of record form as part of the GLC Trial Subpoena Returns (while choosing to object to the simultaneous introduction of other exhibits); and (iii) not making timely objections during the relevant portion of the testimony of Investigative Analyst Danko. Moreover, during the Government's summation and rebuttal summation, defense counsel did not object to the Government's arguments relating to the production of records pursuant to the GLC Grand Jury Subpoena and GLC Trial Subpoena, as is described above.

Significantly, at the time that the defense made these choices at trial, counsel was clearly aware of any potential objection under *Braswell* given their discussion of the decision in their motion to quash the GLC Trial Subpoena. With *Braswell* in mind, defense counsel knowingly and intentionally stipulated to the admission of the GLC Grand Jury Subpoena Returns that included the declaration of the custodian of records signed by Recio, and did not object at trial to the admission of the GLC Trial Subpoena Returns that included an identical signed custodian of records form. Accordingly, given this affirmative waiver by the defendants, the Court should not conduct a plain error analysis based on the above-described record. The defendants waived their newfound objections to Danko's testimony and the prosecutors' summations.

Moreover, even if the defendants' newfound objections were not waived—which is simply not the case based on the above-described record—there was no plain error in admitting the custodian of record forms, eliciting that Recio signed the forms, and arguing to the jury during summations based on this admitted evidence that Recio was involved in preparing the subpoena productions.

1.  *Plain Error Analysis Is Inapplicable because the Defendants Waived Their Newfound Objections*

The defendants cannot and do not claim that their newfound objections were preserved at

trial. They nonetheless claim that plain error review is proper. This is incorrect.

The defendants waived objection to the admission to any of the GLC subpoena returns—including objections to the fact that Recio signed as custodian of record. Defense counsel was clearly aware of *Braswell* based on their filings to quash the GLC Trial Subpoena. Defense counsel nonetheless expressly disclaimed *Braswell* as a basis to quash the subpoena. (*See* Dkt. 112 at 3 n.2). Then, prior to trial, counsel for Recio and Costanzo agreed to a stipulation that the GLC Grand Jury Subpoena and Grand Jury Subpoena Returns—including Recio's signed custodian of record form—were admissible and "may be received into evidence at trial." (GX S3). The Government introduced the records pursuant to the parties' stipulation, and the defense further consented to the admission of the GLC Trial Subpoena and the GLC Trial Subpoena Returns—which also included the exact same signed custodian of record form by Recio—during Danko's testimony. (Tr. 1013:5-10). The defense only objected to *other* exhibits being entered simultaneously during Danko's testimony. (*See id.* ("The Court: Any objection. Ms. Young. Objections as to 450 to 454 and 532 to 534 those were subject to motions *in limine*.")).

This waiver bars the defendants' newfound challenges to the admissibility of this evidence, Danko's reading the evidence into the record, and the Government's arguments to the jury during summations based on the evidence.[5] The defense had these exhibits well before trial—indeed,

---

[5] Recio did not preserve an objection under *Braswell* by burying it in a footnote in his reply brief seeking to quash the GLC Trial Subpoena. As an initial matter, Recio explicitly stated that he was not seeking relief on this ground: "the Court need not rule on the constitutional issues because the government has not satisfied the requirements under Rule 17(c)." (Dkt. 122 at 3 n.2). As set forth herein, *Braswell* further would not have served as a legitimate basis to quash the GLC Trial Subpoena. Moreover, this Court has previously recognized that "new arguments may not be made in a reply brief." *Wilmington Tr., Nat'l Ass'n v. Rafiq*, No. 22-CV-6177 (JPO), 2023 WL 6237680, at *4 (S.D.N.Y. Sept. 26, 2023) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993))). The rationale

they were the source of the documents—and if they had wanted to raise with the Court any objection to the admission of these exhibits they could have at any time. They also could have objected to the introduction of the exhibits at the time the Government sought to introduce them, or when the Government referenced the exhibits during summations. But they did none of the above.

Instead, Recio and Costanzo agreed to the introduction of Recio's signed custodian of record form—the form they now claim violated their constitutional rights—by stipulating that the form was admissible as part of the GLC Grand Jury Subpoena and GLC Grand Jury Subpoena Returns. (*See* GX 522-524 (excerpts of GLC Grand Jury Subpoena Returns); GX 520 at 7 (signed custodian of record form); GX S3 (signed stipulation)); *see also Eldridge*, 2 F.4th at 37 n. 11 (holding that an "affirmative stipulation normally might give rise to a finding of actual waiver (as opposed to mere forfeiture) of the issue, barring all review on appeal."); *Stitsky*, 536 F. App'x at 107 (2d Cir. 2013) (same); *Barlow*, 479 F. App'x at 373 (same). Recio and Costanzo then waived objection to the *exact same form* being introduced as part of the GLC Trial Subpoena and GLC Trial Subpoena Returns at trial. (*See* Tr. 1013:5-10); *see Martinez*, 862 F.3d at 234 (finding waiver where counsel "was specifically asked at trial whether he had any objection to the admission of proffered evidence . . . , he answered, 'None.'"); *Rijo*, 502 F. App'x at 106 (finding waiver where,

---

for this rule is simple—parties should not and cannot sandbag opposing counsel and the court by burying new arguments in belated replies. In any event, raising the existence of the holding in *Braswell* in a footnote of a reply brief in connection with a motion to quash does not remedy the defendant's affirmative waiver at trial with respect to the relevant exhibits that were admitted either through their own stipulation (the grand jury subpoena materials) or through their own affirmative decision not to object to the admission of the exhibits (the trial subpoena materials). If the defense, in fact, intended to object on the basis of *Braswell*, it could have sought a ruling from the Court either prior to or during trial as to the relevant exhibits, including seeking that the custodian of records forms not be admitted or be admitted in redacted form. The defense did nothing of the sort and instead affirmatively waived as to these exhibits being admitted into evidence.

among other things, counsel "plainly stated that he had no objection to admission of the proffered evidence.").

Were that not sufficient, Recio and Costanzo have failed to explain how their waiver was anything other than strategic. Both defendants were clearly aware of *Braswell* based on the pre-trial filings. Yet they chose not to object at trial and even stipulated to the introduction of one of the two custodian of record forms signed by Recio.

Counsel cannot have it both ways. Recio and Costanzo affirmatively agreed to the introduction of GLC's subpoena returns at trial including Recio's signed custodian of record forms. This is waiver. Defense counsel were well aware of *Braswell* at the time they made these affirmative decisions, yet chose not to assert it. They cannot now get a do over after trial. Indeed, the entire doctrine of waiver is designed to avoid exactly this sort of outcome.

2. *Recio Cannot Meet His Burden of Showing a Plain Error Affecting His Substantial Rights and Affecting the Fairness, Integrity, or Public Reputation of Judicial Proceedings.*

Even if the Court finds that the defendants forfeited rather than waived their newfound objections—which it should not for all the reasons detailed above—the defendants cannot show that the Government committed plain error by admitting the custodian of record forms, eliciting that Recio signed the forms, and arguing to the jury during summations based on this admitted evidence that Recio was involved in preparing the subpoena productions. The Government analyzes plain error for each defendant separately because Recio and Costanzo raise different constitutional objections.

### a. Recio Cannot Show Plain Error

Recio first argues, based on *Braswell*, that the jury was improperly notified that Recio was the custodian of record for GLC's subpoena returns. (Recio Br. at 2). However, Recio has failed

to show that admitting GLC's custodian of record forms—and making argument to the jury based on these forms—was plain error.

*Braswell* did not address the issue here—the appropriateness of introducing a signed custodian of record form by the defendant. Although the Second Circuit has yet to opine on the subject, courts within this Circuit and sister circuits have held that custodian of record forms, as a general matter, are "too far removed from the 'principal evil at which the Confrontation Clause was directed' to be considered testimonial." *United States v. Hunt*, 534 F. Supp. 3d 233, 256 (E.D.N.Y. 2021) (quoting *United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011)); *see, e.g.*, *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006)); *United States v. Denton*, 944 F.3d 170, 183-84 (4th Cir. 2019); *United States v. Anekwu*, 695 F.3d 967, 976-77 (9th Cir. 2012); *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007); *United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008), *judgment entered*, 264 F. App'x 16 (D.C. Cir. 2008).

Furthermore, at least one court has addressed circumstances analogous to here—that introducing a custodian of record form signed by the defendant was inappropriate. In *United States v. Stein*, No. 21-20321-CR, 2021 WL 3129628, at *5 (S.D. Fla. July 23, 2021), the defendant sought to quash two grand jury subpoenas served on his companies. The subpoenas sought, among other things, communications, financial records, and corporate work product, including a request that the documents be returned with a standard business records certification. *Id.* at *1. The defendant asserted that he was "not required under the Fifth Amendment to authenticate documents under Fed. R. Civ. 901(a) or certify that the items are business records under Fed. R. Evid. 902(11)." *Id.* at *5. The court rejected the argument because *Braswell* permitted the Government to require a defendant authenticate records in his capacity as a custodian: "[r]equiring [a] custodian

43

to identify or authenticate the documents for admission in evidence merely makes what is implicit in the production itself." *Id.* (quoting *Braswell*, 487 U.S. at 114 (quoting *Curcio*, 354 U.S. at 125)). Further, as the court noted, the Government did "not even seek to compel [the defendant] to be the one to respond to the subpoenas, to authenticate the documents, or to sign the standard business records certification." *Id.* Instead, the "Government only ask[ed] that a custodian of records comply with the subpoenas and that, if Defendant refuse[d] to do so, the companies c[ould] hire someone for that specific purpose." *Id.*

Similar principles apply here. The admission of GLC's custodian of record form, signed by Recio, simply made "explicit what is implicit in the production itself," *Braswell*, 487 U.S. at 114, *i.e.*, that Recio prepared the production. There was never any dispute about this at trial. Recio's counsel admitted in opening statement that GLC was Recio's "own company." (*See* Tr. 122:14-23 ("The evidence will show that after 22 years of being a special agent and a manager, an Assistant Special Agent in Charge, Manny Recio did what a lot of former agents do: Went on the private side of work. Manny . . . opened up his own company, Global Legal Consulting.")). The Government introduced—without objection—incorporation documents showing that Recio was the sole shareholder of GLC, (GX 440A), and the Government also introduced, without objection, bank records and tax returns showing that Recio was the sole employee of the company, (GX 440B; GX 603). Recio also made a deliberate decision to sign the custodian of record form. The Government did not require him to do so. As in *Stein*, the Government addressed the subpoenas to the custodian of record for the company, and Recio could have appointed any agent he wished to serve as custodian of record. Recio declined to do so, stipulated to the admission of the GLC Grand Jury Subpoena returns (containing his signed custodian of record form), and waived objection to the admission of the GLC Trial Subpoena returns (also containing his signed custodian of record

form). This was Recio's decision, and it does not amount to plain error by the Government.

In sum, Recio has failed to show that there was any error, let alone an error that was plain or obvious under controlling Second Circuit and Supreme Court jurisprudence.

### b. Recio Cannot Show that Any Error Affected His Substantial Rights or Affected the Fairness, Integrity, or Public Reputation of Judicial Proceedings.

Recio further cannot meet his burden under plain error review of demonstrating that the error affected the defendant's substantial rights and affected the fairness, integrity, or public reputation of judicial proceedings. "[A]n error is prejudicial where there is a 'reasonable probability that the error affected the outcome of the trial'" *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). Likewise, regarding the final requirement, "in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process." *Id.* (quoting *Marcus*, 560 U.S. at 266)). Accordingly, to have impacted the defendant's "substantial rights and the fairness, integrity or public reputation of the judicial proceedings, the overall effect of the due process error must have been sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the error." *Id.*

Recio asserts in a single sentence, with no explanation, that there was a reasonable probability that the jury would not have convicted him absent the alleged error. (*See* Recio Br. at 4 ("Here, the government's closing arguments that Mr. Recio confessed to the crime in connection with the Trial Subpoena, among the other evidence the government introduced relating to the subpoenas, substantially influenced the jury."). Yet Recio ignores the actual evidence at trial. Any claimed error under *Braswell* was harmless for four separate reasons and did not affect the fairness, integrity, or public reputation of judicial proceedings.

45

*First*, even if the parties had not identified Recio as GLC's custodian, the returns would have had the same weight with the jury. The returns were significant because GLC produced no documentation for payments to EBCO and instead provided incriminating text messages between Recio and Costanzo showing that the $2,500 payment to EBCO was for confidential DEA information. This is precisely what the Government argued to the jury.

> And what did Global Legal Consulting provide as records relating to that EBCO invoice? Text messages from Recio asking Costanzo to run names in the DEA's law enforcement sensitive NADDIS databases. Not any communications between Recio and John Costanzo, Sr., who supposedly EBCO was his company, but messages between Recio and Costanzo and messages specifically asking for DEA confidential information, names that Costanzo did run in the NADDIS database, and where he did provide information to Recio . . . . In other words, you know this $2,500 was money for the information Costanzo was providing because Global Legal Consulting said it was.

(*See* Tr. 1913:13-1914:6). It does not matter whether the custodian was identified as Recio, especially as there was no dispute that GLC was Recio's company. Indeed, defense counsel said as much in his opening. (Tr. Tr. 122:14-23). The importance of GLC's records remains the same.[6] The introduction of the custodian of record form had no prejudicial effect on the jury's verdict, let alone raised a reasonable probability that the jury would not have convicted in the absence of the form.

*Second*, the Government would have made the same argument to the jury during summation—that Recio had possession of and knowledge of the subpoena returns—even if the parties had not identified Recio as GLC's custodian. *Braswell* did not place any limitations on the

---

[6] Moreover, Recio could not have argued in good faith that GLC made a mistake when it produced the returns because the returns were prepared by a third party. Even if the jury was not told that Recio was GLC's custodian, he was still the signatory on GLC's custodian of record form. Accordingly, if counsel had claimed that a third-party custodian had made a mistake, the Government would have immediately objected because counsel lacked a good-faith basis for the claim.

Government's ability to make argument during summation. To the contrary, the Court acknowledged that "if the defendant held a prominent position within the corporation that produced the records, the jury may, just as it would had someone else produced the documents, reasonably infer that he had possession of the documents or knowledge of their contents." *Braswell*, 487 U.S. at 118. That is precisely the situation here. Thus, even under *Braswell* itself, there was no plain error because the Government would have been able to make materially the same arguments. Even in the absence of a custodian of record form signed by Recio, the Government still would have been able to argue to the jury that they could reasonably infer that Recio had possession and knowledge of the records in GLC's subpoena returns. Indeed, the records consisted of Recio's own text messages with Costanzo—records that he clearly would have possessed at some point.

Such argument was fully supported by the record. Recio's counsel himself admitted in opening statement that GLC was Recio's "own company." (*See* Tr. 122:14-23). In addition, the Government introduced—without objection—incorporation documents showing that Recio was the sole shareholder of GLC. (GX 440A). And the Government also introduced, again without objection, bank records and tax returns showing that Recio was the sole employee of the company, (GX 440B; GX 603). There was never any dispute that Recio was the sole employee of GLC. Any jury under such circumstances would reasonably conclude that Recio had full knowledge of what was involved in the GLC subpoena productions—regardless of whether a signed custodian of record form was admitted into evidence—based on his role in the company and that he had knowledge of the contents of the documents. Such eminently reasonable inferences by the jury are entirely permissible under *Braswell.* Once again, the introduction of the custodian of record form had no prejudicial effect on the jury's verdict, let alone raised a reasonable probability that the jury

would not have convicted in the absence of the form.

*Third*, as set forth previously, there was overwhelming evidence of Recio's guilt. The Government introduced Costanzo's own text messages admitting that the $2,500 payment from Recio to Costanzo's father was, in fact, for Costanzo. (GX 317, 701). EBCO and JEM Solutions both received subpoenas and neither produced any contracts, communications, or other evidence consistent with legitimate work having been done in exchange for that money. (*See supra* at 10; GX 706). The Government introduced damning recordings, such as the July 5, 2019 call between Recio, Costanzo, and Guerra, during which Guerra acknowledged that they were "here scheming about how we're going to make money, money money, so we're all on the same page." (GX 203-T; *see also* GX 330 (Recio telling Costanzo to edit a document so that it "look[s] good" because "it's 30 grand right here")). Recio paid for a secret cellphone used by Costanzo that they used to communicate with each other, that Costanzo used that phone to provide confidential DEA information to Recio, and which both Costanzo and Recio lied about when interviewed by law enforcement. (*See supra* at 12). Costanzo deleted hundreds of messages between himself and Recio from his personal cellphone, including messages regarding their—"J[ohn & ]M[anuel']s—cut on a [] case" and how GLC's website was designed to "give *us* credibility." (GX 361A, 362C, 708). Costanzo failed to inform his DEA supervisors of his dealings with Recio, despite the fact that Recio was, according to the defense theory, assisting the DEA by identifying cooperating witnesses. (Tr. 145 (Olesky); Tr. 970-71 (Escobar)). And when rumors about the illicit relationship between Macey and Costanzo began circulating, Costanzo threatened to "find people to put problems on them." (GX 214-T). This is just some of the overwhelming evidence of Recio's guilt that was presented during trial. To claim on this record that there is a reasonable probability that the jury would not have convicted the defendant absent the error is nonsense.

Lastly, any claimed error did not affect the fairness, integrity, or public reputation of judicial proceedings. Recio's role as the owner and controller of GLC was uncontroverted during trial. The Second Circuit has firmly held that the court "will not reverse for plain error where there is no disagreement as to 'the truth of the pertinent facts, and the record as a whole casts no doubt on the accuracy of that [fact].'" *United States v. Joyner*, 313 F.3d 40, 46 (2d Cir. 2002) (quoting *United States v. Gutierrez Rodriguez*, 288 F.3d 472, 477 (2d Cir. 2002)). Accordingly, the introduction of a custodian of record form establishing the undisputed fact that Recio is a custodian for GLC and arguments by counsel relating to the same does not affect the integrity of the judicial proceedings. *See, e.g.*, *Joyner*, 313 F.3d at 46 (failure to submit question of whether the defendant's arson resulted in death did not affect the fairness, integrity, or public reputation of judicial proceedings because the defendant "never contested the fact that the fire he set caused a death"); *United States v. Santana*, 552 F. App'x 87, 93 (2d Cir. 2014) (failure to submit question of whether the defendant brandished a firearm did not affect the fairness, integrity, or public reputation of judicial proceedings because the "evidence supporting [the defendant's] conviction for brandishing a firearm was "overwhelming and essentially uncontroverted" (quoting *United States v. Cotton*, 535 U.S. 625, 634 (2002)); *Johnson v. United States*, 520 U.S. 461, 469-70 (1997) (failure to submit materiality to the jury did not affect the fairness, integrity, or public reputation of judicial proceedings because "[m]ateriality was essentially uncontroverted"); *Cotton*, 535 U.S. at 634 (failure to submit drug weight to the grand jury did not affect the fairness, integrity, or public reputation of judicial proceedings because evidence that the conspiracy involved at least 50 grams of cocaine base was "overwhelming" and "essentially uncontroverted.").

3. *Costanzo Cannot Meet His Burden of Showing a Plain Error Affecting His Substantial Rights and Affecting the Fairness, Integrity, or Public Reputation of Judicial Proceedings.*

49

Costanzo likewise cannot meet his burden under the plain error standard. Costanzo does not and cannot attempt to root his objection in *Braswell.* Instead, his argument is even more attenuated than Recio's. Costanzo argues that the GLC's business records are testimonial hearsay because the Government characterized GLC's productions as a "confession" during summations. (*See* Costanzo Br. at 29). This argument lacks merit.

### a. Costanzo Cannot Show Plain Error

Costanzo first cannot show any plain error. Costanzo, like Recio, admits that business records are not testimonial. (*See* Costanzo Br. at 34 (quoting *Melendez-Diaz*, 557 U.S. at 324; *Feliz*, 467 F.3d at 236)). Rather, "[b]ecause business records cannot be made in anticipation of litigation or include observations made by law enforcement personnel, they 'bear[] little resemblance to the civil-law abuses the Confrontation Clause targeted.'" *Feliz*, 467 F.3d at 234 (quoting *Crawford v. Washington,* 541 U.S. 36, 51 (2004)). Accordingly, "where a statement is properly determined to be a business record as defined by Fed. R. Evid. 803(6), it is not testimonial within the meaning of *Crawford,* even where the declarant is aware that it may be available for later use at trial." *Feliz*, 467 F.3d at 236.[7]

Costanzo instead invents a legal doctrine in his Rule 29 motion—namely, that business records become testimonial whenever the Government characterizes them as "admission" or

---

[7] Costanzo incorrectly conflates the "act of production" doctrine under the Fifth Amendment with the use of testimonial hearsay under the Sixth Amendment. (Costanzo Br. at 34-35). For the purposes of the Fifth Amendment, "the act of production itself could communicate incriminatory statements of facts," *United States v. Greenfield*, 831 F.3d 106, 115 (2d Cir. 2016), because it shows "the existence and location of the documents sought by the Government's subpoena," *United States v. Hubbell*, 530 U.S. 27, 45 (2000). Putting aside that businesses do not have Fifth Amendment rights, the "act of production" doctrine has nothing to do with whether the documents produced by GLC were testimonial hearsay—the Sixth Amendment question. For the purposes of this case, the Confrontation Clause question centers on whether the records were business records.

"confessions" during summation. This is not the law. Costanzo does not cite a single instance where a court has held that the introduction of business records constitutes a "confession" under *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny based on the Government's characterizations during summations. Instead, the cases cited by the defendant deal with actual confessions, by individuals, during plea allocutions or grand jury testimony. *See United States v. Hardwick*, 523 F.3d 94, 99 (2d Cir. 2008) (admission of plea allocution); *United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008) (same); *United States v. McClain*, 377 F.3d 219 (2d Cir.), *supplemented,* 108 F. App'x 670 (2d Cir. 2004) (same); *United States v. Bruno*, 383 F.3d 65, 78 (2d Cir. 2004), *as amended* (Oct. 6, 2016) (plea allocution and grand jury testimony). By comparison, the Second Circuit has unmistakably stated that "a statement properly admitted under Fed. R. Evid. 803(6) cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *Feliz*, 467 F.3d at 233–34. That is what happened here.

Furthermore, the Government's arguments during summation cannot transform non-testimonial statements (*i.e.*, business records) into testimonial ones. The Government is entitled to argue *inferences* to the jury based on the exhibits and the trial testimony, which is what the Government did. The Government characterized GLC's subpoena returns as a "confession" because the company produced incriminating evidence. Moreover, such characterizations by counsel, as the Court advised the jury on multiple occasions, are not evidence. (Tr. 2019:17-22).[8]

---

[8] It is further immaterial that GLC included headers specifying which documents were responsive to which subpoena requests. This is mere formatting. The headers do not change the nature of the documents (business records) or why they were produced (because they were responsive to a subpoena). The Government introduced the GLC Trial Subpoena into evidence, (*see* GX 528), and the jury knew exactly the requests made by the Government and why GLC produced materials. The jury would have come to the exact same conclusions with or without GLC's formatting.

They a do not change the nature of the evidence in the record.

In any event, even if the text messages produced in the GLC subpoena return were testimonial (which they are not), their admission did not violate *Bruton*. As the defendants acknowledge, the "court held that *Bruton* only applied to the use of a confession that 'directly' implicated the defendant, but not to confessions that 'bec[o]me incriminating only when linked with other evidence.'" (Costanzo Br. at 34 (quoting *Samia v. United States*, 599 U.S. 635, 648, 651 (2023)). The text messages produced by GLC do not "directly" implicate either defendant. Instead, they only have significance when taken together with the totality of the Government's evidence at trial, including the testimony of the Government's other witnesses and the absence of records from the other two businesses involved in the bribery scheme—EBCO and JEM Solutions.

In sum, to the extent that was any error (which there was not), it certainly was not plain or obvious under controlling Second Circuit and Supreme Court jurisprudence.

### b. Costanzo Cannot Show that Any Error Affected His Substantial Rights or Affected the Fairness, Integrity, or Public Reputation of Judicial Proceedings.

Costanzo likewise cannot meet the final elements of plain error review—that the error affected the defendant's substantial rights and affected the fairness, integrity, or public reputation of judicial proceedings. Costanzo's claim that the Government violated his Sixth Amendment rights was harmless for multiple reasons and did not affect the fairness, integrity, or public reputation of judicial proceedings.

*First*, Costanzo does not assert his Sixth Amendment rights were violated based on the introduction of GLC's subpoena returns. Costanzo instead argues he is entitled to a new trial based on the Government's characterizations of these returns as an "admission" or "confession" during summations. But arguments by the lawyers are not evidence, and the Court explicitly charged the

jury as such. (*See* Tr. 2019:17-22 ("What the lawyers have said to you is intended to help you understand the evidence or the lack of evidence as you deliberate to reach your verdict."). Moreover, GLC's subpoena returns were powerful evidence regardless of how the Government characterized them as a confession in summations. GLC had no documentation for payments to JEM Solutions and produced incriminating text messages between Recio and Costanzo showing that the $2,500 payment to EBCO was for confidential DEA information. That is what the Government argued to the jury on summation—a reasonable inference based on the documents the admission of which Costanzo does not challenge. (*See* Tr. 1913:13-1914:6).

Second, as with Recio, there was overwhelming evidence of Costanzo's guilt, including his own damning text messages, wiretapped calls, and steps taken to conceal the scheme such as using a burner phone. *Supra* Sec. I.B.1.

Lastly, as with Recio, any claimed error did not affect the fairness, integrity, or public reputation of judicial proceedings. "A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992). Accordingly, even if there were an error, which there was not, the Supreme Court has admonished that "[i]nappropriate prosecutorial comments, standing alone, [do] not justify . . . revers[ing] a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 12 (1985). Instead, "the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Id.* Applying this precedent, the Second Circuit has held that it "is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) (quoting *United States v. Rodriguez,* 968 F.2d 130, 142 (2d Cir.1992)). "An aggrieved party must show more than mere trial error to secure reversal; he must demonstrate

misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him." *Id.* "In assessing whether a defendant has sustained substantial prejudice, we consider the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." *Id.*

Here, the Government argued reasonable inferences to the jury based on the evidence in the record. The Court charged the jury that arguments of counsel are not evidence, and the jury objectively reviewed the evidence in the record. There was no error affecting Costanzo's substantial rights, let alone the fairness, integrity, or public reputation of judicial proceedings.

## III.    The Defendants' Motion To Dismiss Multiplicitous Counts Should Be Denied

The defendants have renewed their argument that bribery under Section 201 and honest services wire fraud are multiplicitous. These arguments lack any support in the caselaw and should be rejected.

### A.  Applicable Law

The Double Jeopardy Clause of the Fifth Amendment "protects a criminal defendant from multiple prosecutions as well as multiple punishments for the same criminal offense." *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). "A multiplicitous indictment 'violates the Double Jeopardy clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once.'" *Id.* Although the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, a defendant does have a right not to receive two punishments for the same crime. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006); *see also United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). Accordingly, "[i]f the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only

54

one of the multiplicitous counts." *Josephberg*, 459 F.3d at 355. Similarly, where the judgment of conviction has already been entered on multiplicitous counts, that right is protected by vacating the conviction on all but one. *Id.*

As the Supreme Court has explained "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1981). "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Kerley*, 544 F.3d 172, 178 (2d Cir. 2008) (quoting *Chacko*, 169 F.3d at 145). Thus, "[a] claim of multiplicity cannot succeed . . . 'unless the charged offenses are the same in fact and in law.'" *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)).

"To assess whether two offenses charged separately in an indictment are really one offense charged twice, courts apply the '*Blockburger* test.'" *United States v. Regensberg*, 604 F. Supp. 2d 625, 632 (S.D.N.Y. 2009) (citations omitted). "Under *Blockburger*, [the Second Circuit] determine[s] 'whether there are two offenses or only one by whether each provision requires proof of a fact which the other does not,'" looking to the elements of the relevant statutes. *United States v. Gore*, 154 F.3d 34, 44 (2d Cir. 1998) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "'If there is an element in each offense that is not contained in the other, they are not the same for the purposes of double jeopardy, and they can both be prosecuted.'" *Regensberg*, 604 F. Supp. 2d at 632 (citing *Chacko,* 169 F.3d at 146). The Court's inquiry is not directed to "the proof the Government may present at trial, but rather on the statutory elements of the offense." *Id.* (collecting cases).

### B. Relevant Facts

On March 13, 2023, the defendants moved the Court to dismiss counts they claimed were multiplicitous, arguing that "bribery is a lesser included offense of honest services fraud." (Dkt. 63 at 20). In its opposition, the Government argued both that the indictment was not multiplicitous and that the defendants' motion was premature as the regular practice in the Second Circuit is to decide such motions after a jury verdict. (Dkt. 69 at 32-40). On July 17, 2023, the Court denied the defendants' motion to dismiss the indictment without prejudice to raise the argument again after trial. (Dkt. 180 at 12).

At trial, the Court instructed the jury that the elements of Count Two, receipt of a bribe as a public official, under 18 U.S.C. § 201(b)(2)(C), included the following:

> *First*, that on or about the dates set forth in the Indictment, Costanzo was a public official;
>
> *Second*, that Costanzo received, accepted, or agreed to receive or accept, a thing of value;
>
> *Third*, that Costanzo did so in return for being induced to perform an act, or not to perform an act, in violation of his official duty; and
>
> *Fourth*, that Costanzo did so with corrupt intent

(Dkt. 170 at 24). The Court instructed the jury that Count Five, honest services wire fraud, under 18 U.S.C. §§ 1343 and 1346, included the following:

> *First*, that during the time alleged in the Indictment, there was a scheme or artifice to deprive the public and the DEA of their right to the honest services of Costanzo through bribery.
>
> *Second*, that the defendant you are considering knowingly and willfully participating in the scheme or artifice, with knowledge of its fraudulent nature and with specific intent to defraud.
>
> *Third*, the scheme or artifice to defraud involved a material misrepresentation, omission, false statement, false pretense, or

concealment of fact; and

> *Fourth*, that in execution of that scheme, the defendant you are considering used, or caused the use by others, of interstate wires.

(Dkt. 170 at 40). In describing the first element of Count Five, the Court instructed the jury that the Government had to prove the existence of a scheme to deprive the public and the DEA of their right to Costanzo's honest services "through bribery," but in further instructing the jury on that element, the Court made no reference to Counts One or Two or the statutory framework of 18 U.S.C. § 201. (*Id.* at 40-41).

### C. Discussion

As set forth in the Government's opposition to the defendants' motion to dismiss the indictment (Dkt. 69 at 32-40), Count One (Conspiracy to Bribe a Public Official) is not multiplicitous of Count Four (Conspiracy to Commit Honest Services Wire Fraud), nor are Counts Two (Public Official Accepting a Bribe) and Three (Bribery of a Public Official) multiplicitous of Count Five (Honest Services Wire Fraud). Rather, as the Court's jury instructions clearly laid out, federal bribery under 18 U.S.C. § 201 contains elements that are distinct from the elements of honest services fraud under 18 U.S.C. §§ 1343 and 1346. As the Court instructed the jury, honest services fraud requires use of wires or mails in furtherance of a scheme, an element not required by Section 201(b)(2)(C). Conversely, Section 201(b)(2)(C) requires proof that a defendant gave, or offered, or promised to give something of value to a federal public official, and that the defendant intended to influence that federal public official to take some action or inaction in violation of his lawful duty, which are not statutorily required to establish a violation of honest services wire fraud. There is thus no serious dispute that each statute requires proof of at least one unique element.

The defendants, knowing that their claim fails under the standard *Blockburger* analysis,

continue to argue that *Skilling v. United States*, 561 U.S. 358 (2010), held that bribery is a lesser included offense of honest services fraud. *Skilling* said the exact opposite: "[o]verlap with [*inter alia*, § 201], does no render § 1346 superfluous. The principal federal bribery statute, § 201 [] generally applies only to federal public officials, so § 1346's application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished." *Id.* n.45. Indeed, there are numerous examples in which defendants have been charged with both federal bribery and honest services fraud, including at least one case where the defendant pled guilty to both, and the Government has not found one case in which bribery was held to be a lesser-included offense of honest services wire fraud. *See United States v. King*, No. CR 18-318 (JDB), 2021 WL 880029, at *5 (D.D.C. Mar. 9, 2021) (defendant pled guilty to both honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; and bribery, in violation of 18 U.S.C. § 201(b)(2)); *see also United States v. Rodrigues*, 22 Cr. 391 (PMH) (SDNY); *United States v. Sotomayor*, 22 Cr. 122 (RDA) (E.D. Va.); *United States v. Collare*, 20 Cr. 17 (M.D. Pa.); *United States v. King*, 18 Cr. 318 (JDB) (D.D.C.) (cases charging both 18 U.S.C. §§ 1343 and 1346; and 18 U.S.C. § 201).

The defendants' argument is not even consistent with their proposed jury instructions. At no point, either in their proposed jury instructions or in the charge conference, did the defendants request that the Court instruct the jury that bribery was a lesser-included offense under Rule 31(c) of the Federal Rules of Criminal Procedure. Nor did the defendants raise any multiplicitous arguments at the charge conference.

To the extent the defendants contend that bribery is a lesser-included offense *in this case* because Costanzo is a federal official, the Second Circuit has explicitly rejected the notion that the facts of a particular case "require a finding of multiplicity." *See United States v. Weingarten*, 713

F.3d 704, 710 n.5 (2d Cir. 2013) ("[T]o the extent that [*United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999)] suggested that 'sometimes the facts at hand' may require a finding of multiplicity, such an approach would be inconsistent with *United States v. Dixon* . . . It makes no difference that the same conduct underlies multiple counts of [the] indictment, so long as the statutes proscribe distinct offenses."). The appropriate analysis is whether the *elements* overlap, and they plainly do not.

Accordingly, the Court should deny the defendants' motion to dismiss multiplicitous counts.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendants' motion for acquittal, for a new trial, and to dismiss certain counts of the Indictment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/_____
Mathew Andrews
Emily Deininger
Sheb Swett
Assistant United States Attorneys
Southern District of New York
(212) 637-6526/-2472/-6522

Dated: February \_\_, 2024
New York, New York